585 F.2d 877
 1978-2 Trade Cases 62,333
 ADMIRAL THEATRE CORPORATION, a Nebraska Corporation, Benson
Drive-In Corp., a Nebraska Corporation, and The
Chief Theatre Corp., a Nebraska
Corporation, Appellants,
v.
The DOUGLAS THEATRE COMPANY, a corporation, Russell Brehm,
an Individual, J.S.B. Amusement Corporation of Nebraska, a
corporation, Sarge Dubinsky, an Individual, Irwin Dubinsky,
an Individual, Mann Theatres Corporation of California, a
corporation, Theodore Mann, an Individual, American
Multi-Cinema, Inc., a corporation; Stanley Durwood, an
Individual, Cooper Theatres, Inc., a corporation, Elwood
Thompson, an Individual, Herman Hallberg, an Individual,
Northwest Cinema Theatre Corporation, a corporation, Melvin
Lebowitz, an Individual, Central States Theatres
Corporation, a corporation, Art Stein, an Individual, Myron
Blank, an Individual, Exhibitor-Appellees,
and also
Universal Pictures, a corporation, Paramount Pictures, a
corporation, Warner Brothers Distributing Corporation, a
corporation, Columbia Pictures Industries, Inc., a
corporation; Allied Artists Pictures Corporation, a
corporation; Twentieth Century Fox Film Corporation, a
corporation; Avco Embassy Pictures Corporation, a
corporation; Cinerama Releasing Corporation, a corporation,
Distributor-Appellees.
 No. 77-1839.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1978.
Decided Oct. 18, 1978.
 
 Earl A. Jinkinson of Winston & Strawn, Robert G. Foster, Chicago, Ill., for appellants; Gregory S. Murray and John L. Huff, Chicago, Ill., on brief.
 William E. Morrow, Jr., of Swarr, May, Smith & Andersen, Omaha, Neb., for appellees (distributor defendant) Universal Film Exchanges, Inc., et al.; Donald J. Buresh, Omaha, Neb., on brief.
 Kenneth C. Stephan of Knudsen, Berkheimer, Endacott & Beam, Lincoln, Neb., for appellees, Cooper Theatres, Inc., et al.; Richard A. Knudsen, Lincoln, Neb., on brief.
 Leo Eisenstatt of Eisenstatt, Higgins, Kinnamon, Okun & Stern, Omaha, Neb., for appellees, The Douglas Theatre Co., et al.; J. Patrick Green, Omaha, Neb., on brief.
 David W. Belin of Herrick, Langdon, Belin, Harris, Langdon & Helmick, Des Moines, Iowa, for appellees, Central States Theatre Corp., et al.; Joel D. Novak, Curt L. Sytsma and Philip E. Stoffregen, Des Moines, Iowa, on brief.
 Before BRIGHT, Circuit Judge, INGRAHAM,* Senior Circuit Judge, and STEPHENSON, Circuit Judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 This is an appeal by unsuccessful plaintiffs in a private civil antitrust action. The plaintiff motion picture theatre corporations sought to recover treble damages for, and injunctive relief from, alleged violations of sections 1 and 2 of the Sherman Act,[1] by defendant motion picture distributors and exhibitors. The action came to trial before the court[2] and a jury. At the close of plaintiffs' evidence and on the motion of defendants, the court directed a verdict in favor of all of the defendants except Central States Theatre Corporation and its officers, who were granted summary judgment prior to trial, See Part II, Infra. Admiral Theatre Corp. v. Douglas Theatre Co., 437 F.Supp. 1268 (D.Neb.1977). On this appeal plaintiffs argue that the evidence in the record was sufficient to warrant submission of the case to the jury. In the alternative plaintiffs claim that "erroneous exclusions" of evidence by the district court prevented them from presenting a submissible case. We affirm the district court.
 
 
 2
 The gist of plaintiffs' complaint is that between March 15, 1970, and March 15, 1974, there existed in the Omaha, Nebraska-Council Bluffs, Iowa, market a conspiratorial agreement among all distributor-defendants[3] and exhibitor-defendants,[4] which unlawfully interfered with plaintiffs' ability to obtain first-run motion pictures for their Omaha theatres resulting in substantial damages to the plaintiffs. The plaintiffs allege that the conspiracy operated by means of a split, a device by which the exhibitor-defendants agreed among themselves that only one, or certain of them, would attempt to license any particular first-run picture offered by a distributor in the Omaha-Council Bluffs market area. The plaintiff corporations, which operated three theatres in Omaha, are owned entirely by the Ralph Blank family.[5] Of the three theatres, the Chief, which closed in 1972, and the Admiral are single screen indoor theatres and the Skyview is a single screen outdoor drive-in theatre.
 
 
 3
 The exhibitor-defendants are competitors of the plaintiffs who owned, operated, or managed approximately 15 first-run movie theatres with 28 screens in the Omaha-Council Bluffs market area between March 15, 1970, and March 15, 1974.[6] The distributor-defendants are in the business of distributing copyrighted first-run motion picture films to exhibitors in the Omaha-Council Bluffs market area as well as throughout the country.
 
 
 4
 We will not attempt to restate the exhaustive evidence produced in the court below and thoroughly discussed by the district court in its published memorandum opinion. Admiral Theatre Corp. v. Douglas Theatre Co., supra. We will merely summarize the evidence sufficiently to support our conclusion that the plaintiffs have failed to establish a submissible case against any of the defendants.
 
 
 5
 The record discloses that in Omaha the distributor-defendants licensed first-run pictures on a system of competitive bidding and negotiation. Under this system bid invitations were sent at the same time to all Omaha exhibitors from the branch offices of the distributors. Bid invitation letters specifically reserved to the distributors the right to reject all bids, even bids that met the minimum suggested terms. Exhibitors responded to bid invitations by submitting written offers of terms or oral notification that they were not submitting a bid but would be willing to negotiate if no bids were accepted. If all bids were rejected, the branch offices of the distributors were instructed either to solicit rebids on the picture or to enter into negotiations to secure the best licensing agreement possible. Final acceptance of an offer by either bid or negotiation was followed by a written license agreement specifying "the theatre and screen at which the picture would be shown, the opening date, the length of the engagement, the terms, if any, on which the exhibitor would hold over the picture after the initial term, whether the exhibitor had a right to an exclusive exhibition or whether it would play the picture simultaneously (day and date) with other theatres, the time, if any, which had to elapse after the end of the run before the picture would be available for a subsequent run ('clearance'), and most importantly, the method by which film rental would be computed and paid." Id. at 1278. The method for determining film rental varied but it usually involved a percentage of gross box office receipts.
 
 
 6
 The objective of the distributors was to obtain the greatest amount of film rental they could from the first exhibition of a picture, as first-run gross receipts are the highest. In evaluating exhibitor offers, the distributors had to make a judgment as to which theatre offered the greatest revenue-producing possibilities. The distributors weighed not only the contract terms offered by an exhibitor, but also the "grossing potential" of the theatres. "Grossing potential" is the demonstrated ability of the theatre to attract patrons, which is largely a matter of physical quality and location.
 
 
 7
 It is undisputed that in the Omaha-Council Bluffs market area during the period from March 15, 1970, to March 15, 1974, quality first-run films were in short supply. In response to this shortage, which had created a sellers' market highly favorable to the distributors, a group of exhibitors entered into a split of product arrangement. Under this arrangement the exhibitors split available first-run motion pictures from all the distributors and they agreed not to bid or negotiate for a film split to another exhibitor, without that exhibitor's consent, in the hope of lowering the film rentals paid to distributors. During the relevant time period there were two separate split arrangements. The first split operated between March 15, 1970, and February 29, 1972, and the second split operated from November 29, 1972, until March 15, 1974. The split was subject to changing membership throughout the entire period. Plaintiffs were at no time members of either split. Both splits involved periodic meetings during which the participants, on a predetermined rotational basis, selected pictures from lists of upcoming releases prepared by one of the participants. Once having selected a picture on the split, the exhibitor still had to bid or negotiate with the distributor. In some instances the exhibitor was unable to come to terms with the distributor.
 
 
 8
 It is plaintiffs' contention that as a result of the split they were successful in licensing only the lower quality first-run films. However, the record reveals that during the period between March 15, 1970, and March 15, 1974, plaintiffs were successful in obtaining approximately 60% of the films upon which they made an offer of specific terms. Nineteen of the pictures upon which plaintiffs had made an offer of specific terms had been allocated by the split. Of the 19, 9 were licensed to plaintiffs (including one day and date with the split member), 9 were licensed to the split members to whom they were allocated (including one which played day and date with plaintiffs), and 2 were licensed to a split member other than the one to whom it was allocated. Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1282-84.
 
 
 9
 Based on a comparable theatre theory of damages the plaintiffs' expert testified that the defendants' activities during the relevant period caused damages of $151,085 to the Admiral Theatre. No damage evidence was admitted with respect to the Chief Theatre or the Skyview drive-in theatre.
 
 
 10
 The standards that a federal court is to apply in passing upon a motion for directed verdict are well settled. The question is whether there is sufficient evidence to support a jury verdict against the moving party. Schneider v. Chrysler Motors Corp., 401 F.2d 549, 554 (8th Cir. 1968). In deciding this question, the trial court must view the evidence in the light most favorable to the nonmoving party and he must be given the benefit of all legitimate inferences without assessing credibility. Banks v. Koehring Co.,538 F.2d 176 (8th Cir. 1976). However, "(a) jury is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not be permitted to resort to speculation." Viking Theatre Corp. v. Paramount Film Distrib. Corp., 320 F.2d 285, 296 (3d Cir. 1963), Aff'd by an equally divided court, 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964); See Twin City Plaza, Inc. v. Central Sur. & Ins. Corp., 409 F.2d 1195, 1202-03 n. 8 (8th Cir. 1969). When the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided, it should be decided by the court as a matter of law rather than submitted to a jury for its determination. Kennedy v. U. S. Construction Co., 545 F.2d 81, 82 (8th Cir. 1976); Gillette Dairy, Inc. v. Hydrotex Inds., Inc., 440 F.2d 969, 971 (8th Cir. 1971). The opinion of the district court reflects a full awareness of these standards. See Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1284-85.
 
 
 11
 The district court recognized that to prevail on their claim under section 1 of the Sherman Act, the plaintiffs had to prove three essential elements:
 
 
 12
 (1) That there was an agreement, conspiracy, or combination among the defendants in restraint of trade;(2) That as a direct and proximate result thereof plaintiffs have been injured in their business and property; and
 
 
 13
 (3) That the damages which the plaintiffs sustained are capable of reasonable ascertainment and are not speculative or conjectural.
 
 
 14
 Id. at 1285.
 
 I. Distributor-defendants
 
 15
 To establish the first element of their case against the distributor-defendants, the plaintiffs had to show with at least circumstantial evidence that the distributor-defendants knowingly participated in the split with the intent to deprive plaintiffs of their "fair share" of quality first-run films. Assuming that the exhibitor split constituted an illegal combination or conspiracy under section 1 of the Sherman Act, the district court found that the evidence presented at trial was insufficient to support any reasonable inference of the distributor-defendants' participation in implementing or promoting the split of first-run films in the Omaha-Council Bluffs market area.
 
 
 16
 The plaintiffs were not required to directly prove the fact of an agreement among the distributor-defendants or between the distributor-defendants and the exhibitor-defendants. Evidence from which an agreement could be inferred is sufficient. American Tobacco Co. v. United States, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Loew's, Inc. v. Cinema Amusements, Inc., 210 F.2d 86, 93 (10th Cir.), Cert. denied, 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115 (1954). However, to avoid a directed verdict "the facts and circumstances relied upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion." Johnson v. J.H. Yost Lumber Co., 117 F.2d 53, 61 (8th Cir. 1941); See Twin City Plaza, Inc. v. Central Sur. & Ins. Corp., supra, 409 F.2d at 1202-03 n. 8; Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 (2d Cir.), Cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); Venzie Corp. v. United States Mineral Prods. Co., 521 F.2d 1309, 1314 (3d Cir. 1975). Furthermore, an inference which a jury is entitled to draw must be based upon proven facts and not upon other inferences. Wesson v. United States, 172 F.2d 931, 936 (8th Cir. 1949); Brown v. Maryland Cas. Co.,55 F.2d 159, 161 (8th Cir. 1932).
 
 
 17
 The plaintiffs correctly note that similar practices by competitors, I. e., "conscious parallelism," will sometimes support an inference of an agreement. However, as the Supreme Court stated in Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954), " 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." An inference of conspiracy is not warranted where the conduct is at least as consistent with legitimate business decisions by the distributor as with the planned exclusion of the plaintiffs. Id. at 540-42, 74 S.Ct. 257; Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17, 19-20 (9th Cir. 1971); Brown v. Western Mass. Theatres, Inc., 288 F.2d 302, 305-06 (1st Cir. 1961). Section 1 of the Sherman Act does not prohibit independent business actions and decisions. Only where the pattern of action undertaken is inconsistent with the self-interest of the individual actors, were they acting alone, may an agreement be inferred solely from such parallel action. First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 279-80, 287, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Aviation Specialties, Inc. v. United Technologies Corp., 568 F.2d 1186, 1192 (5th Cir. 1978); Michelman v. Clark-Schwebel Fiber Glass Corp., supra, 534 F.2d at 1047; Venzie Corp. v. United States Mineral Prods. Co., supra, 521 F.2d at 1314-15; Viking Theatre Corp. v. Paramount Film Distrib. Corp., supra, 320 F.2d at 299; Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 657-59, 681 (1962).
 
 
 18
 The plaintiffs claim that the distributor-defendants joined in the implementation of the conspiracy by engaging in such practices as (1) providing the split with advance release information not available to the plaintiffs; (2) rejecting plaintiffs' bids and accepting inferior bids by split members; (3) according irregular and preferential treatment to split members in the form of moveovers, shortened runs, acceptance of late bids, adjustments of bids and film rentals, advanced licensing, and cancellation of licensed films; and (4) acquiescing to the splitting of their product.
 
 
 19
 It appears from the record that the exhibitor-defendants did receive advance release information concerning release dates, stars, and Motion Picture Association of America ratings from at least some of the distributor-defendants. It is not surprising that a distributor would provide information concerning forthcoming films to any interested exhibitor. It is certainly not inconsistent with the distributor's self-interest to attempt to generate interest in its films. Furthermore, as the district court stated: "Even assuming that this advance information was unavailable to plaintiffs through the various trade journals, it is clear that plaintiffs neither requested nor were designedly refused the information that their competitors had acquired." Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1288.
 
 
 20
 Contrary to the plaintiffs' assertions, the record fails to reveal any systematic rejection of plaintiffs' offers for films in favor of inferior offers from the exhibitor-defendants. As noted earlier in this opinion the plaintiffs were able to license approximately 60% of the films upon which they made an offer. The plaintiffs contend that they were particularly unsuccessful in licensing high grossing first-run films. However, this claim was belied by the fact that of the 19 films upon which plaintiffs made specific offers of terms and which were allocated to the split, 9 were licensed to the plaintiffs. There can be no reasonable inference from such figures that plaintiffs' specific term bids were ignored.
 
 
 21
 The evaluation of competing bids is necessarily somewhat subjective. The most important factor in licensing a film is the grossing potential of a theatre. A theatre's location, quality of furnishings, demonstrated ability to attract patrons, and the type of films previously shown are considered by a distributor in determining a theatre's grossing potential. These factors were generally ignored by Robert Blank in his testimony for the plaintiffs. Blank claimed that the plaintiffs' bids were superior primarily on the basis of larger seating capacity. Larger seating capacity is relevant, however, only if the larger theatre can outdraw the smaller. No such evidence was presented in this case. Conversely, in the movie industry in general, and in the Omaha-Council Bluffs market area in particular, the trend has been away from large single-screen theatres to theatres with smaller auditoriums and multiple screens.
 
 
 22
 It would unduly prolong this opinion to compare in detail plaintiffs' bids with those of their competitors in every instance where a distributor accepted a bid other than the plaintiffs'. See Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1282-84, 1289-90. It is sufficient to state that in no case was a bid by one of the plaintiffs demonstrably superior to that of the competitor who licensed the film. Furthermore, no pattern of similar conduct appears from the distributors' consideration of plaintiffs' offers. See Michelman v. Clark-Schwebel Fiber Glass Corp., Supra, 534 F.2d at 1043; Brown v. Western Mass. Theatres, Inc., supra, 288 F.2d at 305. Contrary to what would be expected if a conspiracy among the distributors existed, the plaintiffs had varying success with different distributors, ranging from a high of 100% acceptance from Twentieth Century Fox to a low of 25% acceptance from Paramount. Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1282-84.
 
 
 23
 Plaintiffs introduced considerable testimony concerning instances where distributor-defendants accepted late bids from exhibitor-defendants, allowed exhibitor-defendants to alter bids, granted moveovers (playing the film on a different screen than originally designated) to exhibitor-defendants, and allowed film runs to be shortened without penalty. The record discloses that on occasion after a film had been licensed by competitive bidding or negotiation, the distributor would request adjustment to contract terms from the exhibitor or grant an adjustment to the exhibitor. During the relevant time period some of the distributors permitted moveovers by the exhibitors to compensate for bidding errors of overestimating or underestimating patronage of a film by placing it in a correspondingly smaller or larger auditorium.[7]
 
 
 24
 The district court observed that plaintiffs' testimony on this issue was exclusively by Robert Blank, whose conclusions were based upon his examination of defendants' documents produced during discovery. The court permitted the opinion testimony to be admitted temporarily and preliminarily. In its published opinion the court stated that it
 
 
 25
 recognized then and recognizes now that this particular testimony raises serious foundational problems. In the first instance, the documents upon which Blank based his opinion had themselves been only "temporarily" admitted into evidence and were not without serious foundational infirmities. See N.R.L.B. v. Sharples Chemicals, 209 F.2d 645 (6th Cir. 1954); Standard Oil Co. v. Moore, 251 F.2d 188 (9th Cir. 1957), Cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958); Fed.R.Evid. 803(6). Blank's opinion testimony, moreover, is based upon inferences drawn from his interpretation of the documents, and it is upon this testimony that distributor-defendants' participation in an illegal scheme is inferred. Such testimony is in clear disregard for the rule against pyramiding inferences, which has heretofore been discussed. See Twin City Plaza, supra. Finally, although claiming that the "irregular" conduct of distributor-defendants deviated from accepted practice or standards of the industry, plaintiffs have failed to offer any evidence other than Blank's opinion testimony as to the nature of those practices and standards.
 
 
 26
 Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1290.
 
 
 27
 Even if Blank's testimony is accepted and considered in the light most favorable to the plaintiffs, it does not support an inference of distributor participation in the split for two reasons. First, none of the actions of the distributors are even intimated to be adverse to the distributors' self-interests. See First Nat'l Bank v. Cities Serv. Co., Supra, 391 U.S. at 279-80, 287, 88 S.Ct. 1575, 20 L.Ed.2d 569; Aviation Specialties, Inc. v. United Technologies Corp., supra, 568 F.2d at 1192; Michelman v. Clark-Schwebel Fiber Glass Corp., supra, 534 F.2d at 1047; Venzie Corp. v. United States Mineral Prods. Co., supra, 521 F.2d at 1314-15; Viking Theatre Corp. v. Paramount Film Distrib. Corp., supra, 320 F.2d at 299. Bid cutoff dates are adopted by distributors for their own benefit and may be waived when it is to their advantage to do so. In no instance was there a showing that the bid accepted was inferior to a timely bid of the plaintiffs. Similarly, in nearly all instances where bid alterations were made they were to make the terms more favorable to the distributors. There is no evidence that the exhibitor-defendants received contract alterations below contract terms offered by the plaintiffs. The instances of bid alterations are not evidence of distributor favoritism to the split, but of distributor pursuit of self-interest. Even on those occasions where adjustments were made to shorten a film's run without penalty the distributors were acting in their own self-interest. By allowing an adjustment when a picture's performance was way under expectations the distributor encouraged higher bids from the exhibitors over the long run. Furthermore, in those situations where the revenue flow was exceedingly small, the exhibitor's economic interest in discontinuing the showing of a film was usually not contrary to the distributor's economic interest. Moreover, the plaintiffs' evidence failed to show any pattern of similar conduct by the distributors in the grant or denial of particular irregularities to exhibitor-defendants. Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1281; See Michelman v. Clark-Schwebel Fiber Glass Co., supra, 534 F.2d at 1043; Brown v. Western Mass. Theatres, Inc., supra, 288 F.2d at 305. The only consistency apparent from the record is that the distributor- defendants accepted late bids, altered bids, or granted moveovers when it was to their advantage to do so. The evidence further shows that contract adjustments were granted after a picture began to run only when such adjustments were requested on pictures that experienced unusually low grosses.
 
 
 28
 Second, there is no evidence that plaintiffs attempted, and were not permitted during the relevant time period, to engage in moveovers, shorten runs without penalties, submit late bids, receive adjustments on pictures licensed by a competitive bid or negotiation, or have availability dates moved up.[8] The district court correctly recognized that under the law of this circuit, "where charges of irregular or preferential treatment are made, there can be no conclusion drawn unless plaintiffs requested and were denied similar treatment." Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1291; See Columbia Pictures Corp. v. Charles Rubenstein, Inc., 289 F.2d 418, 421 (8th Cir. 1961).
 
 
 29
 Finally, plaintiffs argue that the distributor-defendants acquiesced in the operation of the split and that this was sufficient proof of their participation to subject them to liability under the antitrust laws. United States v. Paramount Pictures, Inc., 334 U.S. 131, 161, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).
 
 
 30
 Direct evidence was presented that some of the distributors knew of the Omaha split and the record would support an inference that the other distributors were also aware of the split. On the other hand, the record is devoid of evidence which demonstrates that the distributor-defendants ever attended a split meeting or otherwise participated in the split arrangement. Indeed, the record affirmatively shows that on several occasions the distributor-defendants refused to license a film to the exhibitor-defendant selected by the split. It is quite apparent that profits were the dominant motive in licensing a particular film. The uncontroverted testimony of defendant Sarge Dubinsky was that the first Omaha split was terminated because split member AMC noted that the Douglas theatre, which was not a member of the first split, had been securing too many films over split members to make membership in the split worthwhile.
 
 
 31
 Throughout the entire time period, whenever a first-run film was being distributed in the Omaha-Council Bluffs market area, plaintiffs received bid notices and advance screening notices. It is true that if the distributors received the results of split meetings they might deal with the exhibitor to whom the picture was split, but it was on the distributor's terms. If an agreement was not reached the bids of other exhibitors were solicited. On two such occasions the record indicates that a bid from the plaintiffs was personally solicited by officers of the distributor-defendants. Furthermore, the plaintiffs' track record in their direct confrontation with split members on films allocated by the split negates any inference that the distributor-defendants acquiesced in the split, thereby making the bidding process a sham. In sum, the record clearly shows that when a non-member of the split aggressively sought to license first-run films, it could be quite successful in obtaining such films.
 
 
 32
 In essence plaintiffs' complaint is that they did not obtain all the quality first-run films they desired to run in their theatres. Such a showing does not make a submissible case of an antitrust violation. "(A) distributor has the right to license or refuse to license his film to any exhibitor, pursuant to his own reasoning, so long as he acts independently." Paramount Film Distrib. Corp. v. Applebaum, 217 F.2d 101, 124 (5th Cir. 1954), Cert. denied, 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284 (1955). It is undisputed that during the relevant time period all theatres in the Omaha-Council Bluffs market area, and particularly those in the downtown area,[9] had difficulty securing quality first-run pictures. While we must give the plaintiffs the benefit of every reasonable inference, the plaintiffs' claim of conspiracy by the distributor-defendants leaps from inference into unbounded speculation. Not only did the policies of each distributor differ substantially, additionally there is no evidence indicating that they were mutually formulated or invoked, or that the distributors at any time acted upon the basis of anything other than their own independent business judgment in quest of maximum rental for their films. We have carefully reviewed all of the evidence advanced at trial in support of the conspiracy claim and find it cannot fairly be viewed as raising a reasonable inference of the distributor-defendants' participation in a conspiracy among themselves or with the exhibitor-defendants.
 
 II. Exhibitor Central States
 
 33
 Prior to trial all of the distributor-defendants and exhibitor-defendants filed motions for summary judgment. The motions were based on the records before the court which included pleadings, depositions, discovery documents and affidavits. All of the motions were denied except that of exhibitor-defendant Central States Theatre Corp. and its officers (Central States).[10] In its order of May 11, 1977, granting summary judgment in favor of Central States the court noted:
 
 
 34
 (T)his Court, adopting the justifiable cautious approach utilized by other courts, will not grant summary judgment in a case involving complex antitrust allegations and issues. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Minnesota Bearing Co. v. White Motor Corp., 470 F.2d 1323 (8th Cir. 1973).
 
 
 35
 * * * On the basis of this evidence, again however slight, the Court simply cannot conclude that
 
 
 36
 . . . the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances.
 
 
 37
 Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207 (8th Cir. 1976).
 
 
 38
 Plaintiffs assert that the district court erred in granting summary judgment in favor of Central States. The district court based its order upon its finding that there was no evidence in the record of participation by Central States in any split or conspiracy regarding first-run motion pictures in the Omaha-Council Bluffs area. The court further found that the business of Central States, which operates only drive-in theatres in the Omaha-Council Bluffs area, fell outside the limitations on proof and discovery ordered by the court on March 7, 1977, which limited the issues for trial to those issues relating to first-run motion pictures.
 
 
 39
 Plaintiffs argue that, in accordance with familiar rules regarding the liberal construction of pleadings, their complaint should be construed to include a claim concerning first-run-drive-in films.[11] However, this argument overlooks the fact that the district court, in its order of March 7, 1977, directed that issues for further discovery and proof at trial be limited to the subject of first-run movies, which was the primary thrust of plaintiffs' complaint.
 
 
 40
 The district court exercised its discretion in limiting the scope of discovery and proof at trial to what the court perceived were the central issues. The district court must be free to use and control pretrial procedure so to insure the orderly administration of justice. Link v. Wabash R. R., 291 F.2d 542, 547 (7th Cir. 1961), Aff'd, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). In his pretrial role, the district judge must at times assume the active part of "director of litigation * * * (free to) strip the controversy of nonessentials, and to mold it into such form as will make it possible to dispose of the contest properly with the least possible waste of time and expense." Buffington v. Wood, 351 F.2d 292, 298 (3d Cir. 1965), Quoting from Committee on Pretrial Procedure to the Judicial Conference of the District of Columbia, Report, 4 Fed.Rules Serv.L.R. 47 (1941). The district court's discretionary power to limit discovery and proof at trial extends to complex litigation involving lengthy discovery procedures. See Aviation Specialties, Inc. v. United Technologies Corp., supra, 568 F.2d at 1189-90; 1 Pt. 2 Moore's Federal Practice P 2.40 (2d ed. 1978) (hereafter Manual for Complex Litigation). In the present complex litigation, we find no abuse of discretion by the district court. Federal Deposit Ins. Corp. v. Glickman,450 F.2d 416, 419 (9th Cir. 1971); Davis v. Duplantis, 448 F.2d 918, 921 (5th Cir. 1971).
 
 
 41
 We turn now to a consideration of the record which plaintiffs suggest is sufficient to withstand Central States' motion for summary judgment. In considering this evidence, we are mindful, as was the trial court, that summary judgments should be granted sparingly in antitrust suits, particularly when the action is based on complicated and extensive evidence. See Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); Poller v. Columbia Broadcasting,368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Modern Home Inst. Inc. v. Hartford Acc. & Ind. Co., 513 F.2d 102, 109 (2d Cir. 1975). However, once a defendant has shown that the facts upon which a plaintiff relies are not susceptible to plaintiff's interpretation, summary judgment may be appropriate. First Nat'l Bank v. Cities Serv. Co., supra, 391 U.S. at 288-90, 88 S.Ct. 1575; Modern Home Inst. Inc. v. Hartford Acc. & Ind. Co., supra,513 F.2d at 109.
 
 
 42
 Plaintiffs contend that certain documents they introduced into the record suggest a conspiracy between Central States and distributor-defendant Twentieth Century Fox to license a first-run film prior to the bid due date. We do not agree. The documents in question refer to the 1974 "re-issue" of the film "Butch Cassidy and the Sundance Kid," and the offer of this film for a " first-run" during the re-issue period. Because this film was not first-run in 1974, no possible inference of conspiracy regarding first-run films may be drawn from these documents. Since the district court limited issues for trial to those relating to first-run films, these documents present no evidence sufficient to withstand Central States' motion for summary judgment. Plaintiffs also contend that the deposition of Russell Brehm, president of Douglas Theatre Company, indicates participation of Central States in a split among drive-in theatre owners in the Omaha-Council Bluffs area. Such an assertion, even if proven, is outside the scope of the issues for trial as limited by the district court.
 
 
 43
 Finally, plaintiffs contend that evidence in the record suggests that Central States, which operates several theatres outside the Omaha-Council Bluffs area, used its multi-theatre buying power to improperly obtain film licenses over competitors in certain markets. This argument was not made to the district court during the hearing on Central States' motion for summary judgment on May 6, 1977. After summary judgment was granted in favor of Central States and its officers on May 11 and May 17, 1977, plaintiffs raised this argument for the first time in support of an untimely motion to reconsider and deny Central States' motion for summary judgment. This motion was filed on June 13, 1977, well beyond the ten-day limit required by Fed.R.Civ.P. 59(e).[12] A motion to reconsider and deny a motion for summary judgment is a motion to alter or amend a judgment within the meaning of Fed.R.Civ.P. 59(e). See, e. g., Sonnenblick-Goldman Corp. v. Nowalk, 420 F.2d 858, 859 (3d Cir. 1970). Accordingly, this contention, not timely raised below, is not properly before this court for review.
 
 
 44
 After a careful consideration of the entire record we are satisfied there was no error in the district court's grant of summary judgment in favor of Central States.
 
 III. Exhibitor-defendants
 A. Per Se Illegality
 
 45
 Plaintiffs contend that the conduct of exhibitor-defendants (other than Central States, See Part II, Supra ) was per se illegal under the per se rule defined in Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958): "(C)ertain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Plaintiffs argue that exhibitor-defendants' conduct can be found to be per se illegal on the basis of (1) group boycott; (2) price fixing; (3) horizontal market division; or (4) split activities.
 
 
 46
 The leading authoritative case concerning group boycott activities is Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The essential element in Klor's is that there be a concerted refusal to deal either to force a change in the practices of the boycotted firm's activities or to exclude it from competition. Id. at 212, 79 S.Ct. 705; E. Rockefeller, Antitrust Questions & Answers 21 (BNA 1974). The plaintiffs here were not excluded from the split by exhibitor-defendants. And as discussed earlier, there is no reasonable view of the evidence that would allow the conclusion that the distributor-defendants refused to deal with the plaintiffs.
 
 
 47
 In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940), the Court stated that when a combination was formed for the "purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce" it was price fixing and it was per se illegal. It is not disputed that the split was formed in this case in order to reduce the number of bids distributors would receive on the films they offered and thus hopefully lower the film rentals paid by the exhibitor-defendants. The purpose of the split was at least partially accomplished in that the number of bids received during the split period was significantly lower than before. The question which presents difficulty is whether the purpose of reducing competitive bidding with the hope of obtaining designated films at lower prices satisfies the Socony price fixing definition:
 
 
 48
 Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible. Price-fixing as used in (United Sates v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927)) has no such limited meaning. An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used. That price-fixing includes more than the mere establishment of uniform prices is clearly evident from the Trenton Potteries case itself, where this Court noted with approval Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 ((1905)), in which a decree was affirmed which restrained a combination from "raising or lowering prices or fixing uniform prices" at which meats will be sold. Hence, prices are fixed within the meaning of the Trenton Potteries case if the range within which purchases or sales will be made is agreed upon if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon.
 
 
 49
 United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 222, 60 S.Ct. at 844. The definition is far-reaching, yet the Court does seem to require more than an agreement to do something which will hopefully lower prices. No prices were agreed upon in this case. No range of prices was agreed upon. The agreement focused upon curtailing bidding competition so as to hopefully lower prices. The agreement does not fall squarely within the Socony definition of price fixing.
 
 
 50
 However, the Supreme Court, in National Soc. of Prof. Eng'rs v. United States, 435 U.S. 679, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), does suggest that a reduction in competitive bidding, while "not price fixing as such" is "illegal on its face" because it interferes with the setting of prices by the free market forces. The Court appears to hold the Society of Professional Engineers' ethical standard forbidding submission of competitive bids illegal on the basis that it was unreasonable under the rule of reason established in Chicago Bd. of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), rather than on the basis that it was per se illegal. The Court also mentions the language in Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), indicating that business activities would be treated more harshly than professional organizations in evaluations as to restraints of trade.
 
 
 51
 In (Goldfarb ) the Court noted that certain practices by members of a learned profession might survive scrutiny under the Rule of Reason even though they would be viewed as a violation of the Sherman Act in another context. The Court said:
 
 
 52
 "The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the profession, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today."
 
 
 53
 National Soc. of Prof. Eng'rs v. United States, supra, 98 S.Ct. at 1362-63, Quoting from Goldfarb v. Virginia State Bar, supra, 421 U.S. at 788-89 n. 17, 95 S.Ct. 2004.
 
 
 54
 Thus while it appears that price fixing may not necessarily require a "fixed price" or a "fixed price range," it is unclear whether an agreement to reduce competitive bidding in private business activities is sufficient to be categorized as price fixing and thus per se illegal.
 
 
 55
 The leading case on the legality of horizontal market divisions is United States v. Topco Assocs., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In Topco, several small grocery chain owners joined to form an association by which to obtain merchandise on a large scale basis in order to compete with larger national and regional grocery chains. The members of the Topco organization owned all of the stock and voted on all new applications for membership. Membership approval required a 75% Affirmative vote of all members. However, any member who operated a business within 100 miles of a new applicant's location could vote no, and thus force an 85% Affirmative vote before the applicant was approved. "Because * * * members cooperate in accommodating each other's wishes, the procedure for approval provides, in essence, that members have a veto of sorts over actual or potential competition in the territorial areas in which they are concerned." United States v. Topco Assocs., supra, 405 U.S. at 602, 92 S.Ct. at 1131. If a new applicant was approved as a member, he signed an agreement which designated what area would be his. If he violated the agreement by selling outside of his licensed area, his membership could be terminated and Topco products would become unavailable to him. In Topco, the Court found the structure to be a horizontal market division and thus per se illegal.
 
 
 56
 The market division here differs from Topco in that it is a product allocation not a territory allocation. Nevertheless the substance would appear to be the same in that certain theatres have been allocated the exclusive right, among split members, to bid on certain films, thus limiting the market "territory" to the split member's theatre. Yet, what is lacking in this fact situation, and what played an important part in the Topco reasoning, was the veto power each Topco member possessed. By exercising this veto, any member could eliminate an applicant from consideration, and thus eliminate the applicant's access to Topco products.
 
 
 57
 The plaintiffs here were never prohibited from bidding on a film; indeed, no exhibitor was prohibited unless he joined the split. Thus, while the general language of Topco can support an inference of a per se violation in this case,[13] the specific factual structure of Topco, and the repercussions of the factual structure when combined with the market division, cannot be overlooked. It is these essential differences that distinguish this case from Topco.
 
 
 58
 In the only case before the Supreme Court on the issue of per se illegality of theatre splits, the court of appeals' holding that splits were not per se illegal was affirmed by an equally divided Court. The Third Circuit stated in its opinion, Viking Theatre Corp. v. Paramount Film Distrib. Corp., supra, 320 F.2d at 293:
 
 
 59
 We are of the opinion that the failure to include all exhibitors in the split system will not render it illegal in the absence of evidence that it was so employed as to unreasonably restrict the competitive market, or had this result. * * * There is no evidence in this case that the split system, standing alone, had this effect, or was so intended. Therefore, we decline to hold the split system to be per se illegal, and we do not consider the system, standing alone, as evidence of a conspiracy to violate the antitrust laws.
 
 
 60
 In accord with Viking are Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17 (9th Cir. 1971); Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., 268 F.2d 246 (2d Cir.), Cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959); Seago v. North Carolina Theatres, Inc., 42 F.R.D. 627 (E.D.N.C.1966), Aff'd, 388 F.2d 987 (4th Cir. 1967), Cert. denied, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968). Contra, Cinema-Tex Enterprises v. Santikos Theatres, Inc., 414 F.Supp. 640 (W.D.Tex.1975), Aff'd in part & rev'd in part, 535 F.2d 932 (5th Cir. 1976).
 
 
 61
 We refrain from deciding whether the theatre split in this case was illegal per se under any of the per se categories raised by plaintiffs inasmuch as Even if a per se illegality were found to exist, plaintiffs must still succeed in showing the fact of legal injury, proximate cause and damages sufficient to get to the jury. Plaintiffs have failed to do this.
 
 
 62
 B. Legal Injury, Proximate Cause and Damages
 
 
 63
 In order to establish a private cause of action under the Clayton Act, plaintiffs must show to a reasonable certainty that there has been injury to them by reason of the alleged antitrust violation. 15 U.S.C. §§ 15, 26; Merit Motors, Inc. v. Chrysler Corp., 187 U.S.App.D.C. 11, 15, 569 F.2d 666, 670 (1977); McCleneghan v. Union Stockyards, 349 F.2d 53, 56-57 (8th Cir. 1965). Plaintiffs must show this, regardless of whether the violation is thought to be unreasonable or per se illegal. 15 U.S.C. § 15. See Wolfe v. National Lead Co., 225 F.2d 427, 432-33 (9th Cir. 1955); P. Areeda, Antitrust Analysis 75 (1974); Timberlake, The Legal Injury Requirements & Proof of Damages in Treble Damage Actions Under the Antitrust Laws, 30 Geo.Wash.L.Rev. 231, 232 (1961). In addition, the damages accruing from the injury must be capable of reasonable ascertainment and must not be speculative or conjectural. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); McCleneghan v. Union Stockyards, supra, 349 F.2d at 56-57.
 
 
 64
 The injuries or facts of damage plaintiffs alleged included loss of income from lack of first-run films at the Skyview and the Admiral, being forced to sell the Chief Theatre because of lack of first-run films, and being placed in a relatively inferior bidding position for first-run films. If, concerning any of these allegations of injury, plaintiffs showed legal injury, evidence sufficient to allow a reasonable basis upon which an estimate of damages could be placed, and the causal relationship between the defendants' illegal conduct and the plaintiffs' damages, then the question should have been submitted to the jury.
 
 
 65
 The Chief Theatre was closed in December of 1972, and that this constituted legal injury to plaintiffs cannot seriously be disputed. Plaintiffs attempted to show that the causal connection between defendants' actions and the closing of the Chief related to the matter of lack of success in getting first-run films. This alleged loss of films also constituted the alleged primary fact of injury to the Admiral and the Skyview.
 
 
 66
 We can initially consider as a possible part of the fact of injury each first-run film which plaintiffs did not receive. Plaintiffs still had to show, however, that they bid or attempted to negotiate to get each of those films, and that they were unjustifiably denied those films. One cannot show "fact of injury," by alleging he did not receive something when he initially never tried to obtain it. Thus, the "demand prerequisite" is also inherently necessary in showing damages, plus the causal connection of those damages to the split activities. See Dahl, Inc. v. Roy Cooper Co., supra, 448 F.2d at 19; Royster Drive-In Theatres, Inc. v. American Broadcasting-Paramount Theatres, Inc., supra, 268 F.2d at 251; J.J. Theatres, Inc. v. Twentieth Century-Fox Film Corp., 212 F.2d 840, 845 (2d Cir. 1954). If plaintiffs never attempted to obtain the film, Ipso facto, exhibitor-defendants could not have prevented them from obtaining it, and thus could not have caused damages. "We know of no principle of law which authorizes a person aggrieved by the deprivation of a right either statutory or constitutional to recover for such deprivation in the absence of a demand or request for its exercise." Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561, 568 (7th Cir. 1951).[14]
 
 
 67
 Thus, plaintiffs, as the district court warned in its order of March 7, 1977, could only recover under the demand prerequisite method for motion pictures upon which they bid and were unjustifiably denied their bid. Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1299. As discussed in Part I of this opinion, plaintiffs failed to show that distributors unjustifiably denied any of their bids. Thus plaintiffs' only alternative to showing legal injury, damages, and the causal connection necessary for relief was by use of the comparative theatre theory. This theory primarily grows out of Bigelow v. RKO Radio Pictures, Inc., Supra, 327 U.S. at 266, 66 S.Ct. at 580, where the Court found the comparative theatre method an acceptable one (in addition to other evidence) to "support a just and reasonable inference that petitioners were damaged by respondents' action * * * ." However, the comparative method established in Bigelow was used to show the difference in income between the theatres showing first-run films and the theatre allegedly denied all access to first-run films (a second-run theatre). The comparison was not, as we had here, between two alleged first-run theatres, one of which it was claimed was not getting enough quality first-run films.
 
 
 68
 In relying on the comparative theatre method of recovery instead of the demand prerequisite method, plaintiffs had to show that it would have been futile to make bids on all first-run films they wanted. Only by this foundational route could plaintiffs appropriately use the comparative theatre method for showing causation. For if plaintiffs could not show futility of demand, there remained no justification for not using the demand prerequisite theory. And, as discussed in Part I, the method by which plaintiffs attempted to show futility of demand, "the allegedly irregular and preferential treatment afforded exhibitor-defendants" is completely unsupported by the record. The plaintiffs have not given any reasonable basis from which it could be inferred that distributors did anything more than make independent business judgments deciding where they could lease their film and make the most profit.
 
 
 69
 The district court refused to permit plaintiffs' expert witness, Dr. John Richard Felton, to testify in regard to the comparative theatre method as to the Chief and the Skyview inasmuch as "(t)he facts and circumstances relied upon by plaintiffs * * * simply do not 'attain the dignity of substantial evidence,' (and) could only create an unfounded 'suspicion' in the minds of the jury." Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1296 (citations omitted). We agree with the district court and would also extend this observation to the foundation for Felton's testimony in regard to the Admiral.
 
 
 70
 Without Felton's testimony there was no evidence concerning the Chief or the Skyview upon which the jury could have found a causal connection or could have based an estimate of damages for these two theatres. Thus, plaintiffs failed to show the necessary elements for recovery under the demand prerequisite method or the comparative theatre method for either of these theatres, and the trial court upon this basis, properly directed a verdict as to the Chief and the Skyview.
 
 
 71
 Felton did offer testimony concerning causation and damages to the Admiral. However, even if there was adequate foundation for Felton's comparative theatre testimony concerning the Admiral insofar as futility of demand (legal injury) was required, it was wholly inadequate on other grounds. Initially, Felton's qualification as an expert was questionable. Felton admitted he was not an expert on theatre quality; that the expertise he did possess evolved entirely from his participation in this case; and that he relied upon the Blanks' knowledge of theatres as a basis for determining comparability.[15]
 
 
 72
 In addition to his questionable qualifications as an expert, the content of Felton's testimony the only testimony offered upon which the jury could find causation and damages failed to meet the threshold established by this court in Twin City Plaza, Inc. v. Central Sur. & Ins. Corp., supra, 409 F.2d at 1200: "When basic foundational conditions are themselves conjecturally premised, it then behooves a court to remove the answer from one of admissible opinion to one of excludable speculation." Indeed, Felton's entire comparative theatre testimony was based upon a fictional theatre the Astro and the Dundee taken together and halved. Thus, the Admiral was compared to a conjectural theatre, the "Astree." Felton was not an expert in theatre quality, and lacking the specific knowledge and information necessary, relied upon the Blanks' conclusion that this hypothetical theatre would be "comparable" to the Admiral. The Blanks' opinion, in turn, was "apparently based primarily upon the geographical proximity of the three theatres, and the fact that the seating capacity of the Astro plus that of the Dundee divided by two is roughly equivalent to that of the Admiral." Admiral Theatre Corp. v. Douglas Theatre Co., Supra, 437 F.Supp. at 1297.
 
 
 73
 Additional foundational infirmities were listed at length by the district court, Id. at 1298, all of which indicate the testimony was inadmissible in the first place; at the very least, if admissible, it was inadequate to provide anything more than a speculation as to the causation of plaintiffs' alleged injury. Plaintiffs failed to show this necessary element, thus the district court correctly directed the verdict for the defendants with respect to the Admiral.
 
 
 74
 We discuss damages briefly with respect to the Admiral, Skyview and Chief. The issue of damages is not essential to support the directed verdict. The complete lack of proof, however, reflects the general stature of plaintiffs' case. There was no evidence in regard to damages concerning the Skyview and Chief. Thus plaintiffs failed with respect to these theatres to make a submissible case. The only evidence of damages offered in regard to the Admiral was the resulting $151,085 figure derived by the comparative theatre method.[16] The total lack of foundation concerning this method of proof, the infirmities in the expert's qualifications and the infirmities in the expert's use of the comparative theatre method did not provide the reasonable basis for damages the Supreme Court required in Bigelow :
 
 
 75
 (T)he jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential, as well as direct and positive proof."
 
 
 76
 Bigelow v. RKO Radio Pictures, Inc., supra, 327 U.S. at 264, 66 S.Ct. at 579 (citations omitted). "(T)he 'tendency of the courts is to find some way in which damages can be awarded where a wrong has been done.' Nevertheless, a plaintiff in such actions may not recover compensatory damages for loss of prospective profits based on mere speculation, surmise and conjecture." National Wrestling Alliance v. Myers, 325 F.2d 768, 777 (8th Cir. 1963) (citations omitted).[17]
 
 
 77
 A jury could have relied on nothing but speculation, surmise and conjecture in awarding damages here. It would have been, as Judge Hanson said, "but idle ceremony" for this case to have been submitted to the jury.
 
 
 78
 Finally, we examine plaintiffs' claim of being placed in a relatively inferior bidding position in that if plaintiffs did not bid for a split film, the designated split member had no competition; in comparison plaintiffs always had competition because the split member was obligated to bid. Assuming arguendo injury and causation were adequately shown by Felton's testimony, plaintiffs failed to take this theory any further. No evidence of damages was ever offered; there was simply nothing to submit to the jury. Thus, the plaintiffs failed to prove any of their theories, and the directed verdict was proper.
 
 IV. Miscellaneous Rulings
 
 79
 Plaintiffs argue that even if sufficient evidence warranting submission of their claims to the jury was not presented, they are entitled to a new trial because they were prevented from presenting the necessary evidence by erroneous rulings of the district court.
 
 
 80
 These rulings must be considered against the background of the procedural history and factual setting of this case. The complaint in this action was filed on March 15, 1974. On January 17, 1977, Judge Hanson was designated to complete the processing and trial of the cause of action. At a pretrial conference on February 22, 1977, it became apparent to the court that the lawsuit and attendant discovery proceedings had been stalled for almost a year. The court adjusted its schedule to permit the plaintiffs additional time to conduct further discovery. At this time defendants' motion to limit proof at trial to those first-run films upon which the plaintiffs had made demand was overruled. However, plaintiffs' proof at trial was confined to first-run films released in the Omaha-Council Bluffs market area between March 15, 1970, and March 15, 1974.
 
 
 81
 In its memorandum opinion the district court stated that from that time on "the proceedings were marked by plaintiffs' failure to meet Court imposed deadlines and to take full advantage of those further discovery opportunities that had been permitted." Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1274. Although the court believed that the plaintiffs' dilatoriness and inadequate trial preparation would have justified dismissal of the action, See National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), it allowed the case to proceed to trial.
 
 
 82
 The plaintiffs object to the trial court's ruling which denied admission to 46 exhibits offered by the plaintiffs pertaining to specific licensing transactions. The court excluded the exhibits on two grounds: (1) they were not called to the attention of the defendants prior to trial, and (2) they could only be considered cumulative.
 
 
 83
 At the pretrial conference on February 22, 1977, the district court informed the parties that the action would be processed under the procedures specified in the Manual for Complex Litigation and that pretrial filings of witness lists, exhibit lists, stipulations, proposed jury instructions and pretrial briefs would be required and strictly enforced. See Manual for Complex Litigation, Supra, §§ 1.11, 3.30. Contrary to the pretrial orders of the court, the plaintiffs did not file their pretrial briefs or list of exhibits until the first day of trial on June 13, 1977. In addition, the 46 exhibits related to specific pictures regarding which the plaintiffs had made no complaint during pretrial discovery. As a result the defendants would have been prejudiced by admission of the exhibits in that they were unprepared to cross-examine or present their own evidence relating to these transactions. If it admitted these exhibits, the district court felt that to avoid prejudice to defendants it would have been compelled to grant a continuance to allow the defendants an opportunity for discovery on the new issues raised.
 
 
 84
 In a complex case the trial court must manage the proceedings with a fair but firm hand to prevent excess expense and delay. See Gaylord Shops, Inc. v. South Hills Shoppers' City, Inc., 33 F.R.D. 303, 305 (W.D.Pa.1963); Manual for Complex Litigation, Supra, § 1.10; Prettyman Report, Procedure in Anti-Trust and Other Protracted Cases, 13 F.R.D. 41, 65-66 (1951). The district court has the discretionary power to exclude exhibits not disclosed in compliance with its pretrial orders. Kozar v. Chesapeake & O. Ry., 320 F.Supp. 335, 374 (W.D.Mich.1970), Aff'd in part & vacated in part for other reasons, 449 F.2d 1238 (6th Cir. 1971); Fed.R.Civ.P. 37(b)(2)(B); Manual for Complex Litigation, Supra, §§ 3.30, 4.23; D.Neb.R. 25(B)(1). Its ruling will be overturned on appeal only if there is a clear abuse of its discretion. Federal Deposit Ins. Corp. v. Glickman, supra, 450 F.2d at 419; Delta Theatres, Inc. v. Paramount Pictures, Inc., 398 F.2d 323, 324 (5th Cir. 1968), Cert. denied, 393 U.S. 1050, 89 S.Ct. 688, 21 L.Ed.2d 692 (1969).
 
 
 85
 In the present case the district court excluded the exhibits because of noncompliance with its pretrial orders only after repeatedly warning the parties that it intended to strictly enforce its pretrial orders and subsequently modifying its orders to accommodate the plaintiffs' requests for more time. We are satisfied that the district court did not abuse its discretion in excluding the exhibits on this basis alone. Therefore, we do not reach the issue of whether the court abused its discretion in excluding the exhibits as cumulative.
 
 
 86
 The plaintiffs also attempted to introduce into evidence the testimony of Alfred Corbino. Although the plaintiffs were directed to have their witness list filed on May 11, 1977 (after receiving an extension from May 2), the identity of Corbino as a witness for the plaintiffs was not disclosed to the defendants until the plaintiffs filed their list of witnesses on June 13, 1977, the first day of trial. The district court refused to let Corbino testify because his name was not timely disclosed to the defendants and because he refused to let the defendants examine documents in his possession, which would have been needed for cross-examination, until the day he was scheduled to testify.
 
 
 87
 The plaintiffs' offer of proof discloses that Corbino would have testified concerning his efforts to open a theatre in Omaha and obtain first-run films. Examination and cross-examination of Corbino would have involved the circumstances surrounding his bids on 39 films of which he obtained none. In effect, the jury would have been asked to hear a separate antitrust action to determine the probative value of his testimony without giving the defendants the benefit of discovery.
 
 
 88
 Similar to its discretionary power to exclude exhibits, the district court may refuse to permit the testimony of witnesses not listed prior to trial. United States v. Pirnie, 472 F.2d 712, 713 (8th Cir. 1973); Fed.R.Civ.P. 37(b) (2)(B); Moore's Federal Practice P 16.16, at 1127 (2d ed. 1974); Manual for Complex Litigation, Supra, §§ 3.30, 4.23; D.Neb.R. 25(B)(2)(D). The power of the trial court to exclude exhibits and witnesses not disclosed in compliance with its discovery and pretrial orders is essential to the judicial management of a complex case. When the district court's ruling is considered as part of the total procedural history of this case, we are convinced that the district court did not abuse its discretion in refusing to allow Corbino to testify.
 
 
 89
 In their brief to this court the plaintiffs challenge various other evidentiary rulings by the district court. We have examined each allegation of error and find that the plaintiffs' contentions are without merit.
 
 
 90
 The plaintiffs' next claim of error is that the district court abused its discretion in limiting the plaintiffs' discovery. Plaintiffs' primary complaints are that discovery and proof at trial were limited to first-run motion pictures released by distributor-defendants in the Omaha-Council Bluffs market area during the period from March 15, 1970, to March 15, 1974, and that plaintiffs' discovery addressing proof of damages was limited to those pictures for which plaintiffs made specific demand.
 
 
 91
 Soon after the complaint in this action was filed on March 15, 1974, discovery by plaintiffs concerning the splitting of first-run films for indoor theatres in the Omaha-Council Bluffs market area followed. On March 28, 1975, the court entered an order so limiting discovery until the depositions of Ralph, Geraldine and Robert Blank had been taken and certain documents had been produced by the plaintiffs. No other discovery procedures were undertaken by the plaintiffs until the final pretrial conference on February 22, 1977, despite the fact that at a pretrial conference held on September 10, 1976, it was agreed by counsel that plaintiffs' discovery would be completed by November 24, 1976, and a trial date in February 1977 would be attempted. At the February 22, 1977, pretrial conference, in complete disregard of the earlier conference, the plaintiffs filed a number of sets of interrogatories and requests for production and announced their intention to take approximately 23 additional depositions. The district court indulged the plaintiffs in every reasonable accommodation in an effort to allow this additional discovery and still have the trial in May or June of 1977. However, these depositions were never taken.
 
 
 92
 Although the district court limited discovery relating to proof of damages to films on which the plaintiffs had made specific unsuccessful demands, it allowed discovery of non-demand films for the purpose of showing the existence of the conspiracy to prevent plaintiffs from bidding on certain films. The court stated that it would modify its order to allow discovery addressing proof of damages to non-demand films if the plaintiffs showed that the activities of defendants made it futile to demand films.[18] The order of the district court was broad enough to permit discovery of information which could be used to support a claim of futility if such were in fact the case. The plaintiffs ultimately failed to show the futility of demand, and consequently the district court properly retained its ruling limiting discovery of damages.
 
 
 93
 Orders by a trial court limiting discovery are within the sound discretion of the court and will not be cause for reversal unless an abuse of discretion is shown. Perel v. Vanderford, 547 F.2d 278, 280 (5th Cir. 1977); Huff v. N.D. Cass Co., 468 F.2d 172, 176-77 (5th Cir. 1972), Modified en banc, 485 F.2d 710 (1973); Barnard v. Wabash R.R., 208 F.2d 489, 498 (8th Cir. 1953). No such showing has been made here. In a complex case to keep discovery within bounds of reason and relevancy the court must establish limits of time and subject matter. Manual for Complex Litigation, Supra, §§ 2.40, 4.30; Prettyman Report, Procedure in Anti-Trust and Other Protracted Cases, Supra, 13 F.R.D. at 73-74. We have examined all of the alleged errors in limiting discovery asserted by the plaintiffs and we are convinced that the limitations which the court imposed were clearly within its discretion.
 
 
 94
 The plaintiffs next contend that the district court improperly assessed plaintiffs $1,000 for attorney fees and office expenses incurred by the defendants in taking the second deposition of plaintiffs' expert witness, Dr. Felton. As early as February 18, 1976, and repeatedly thereafter, the district court stressed the need for plaintiffs to get an expert at an early date so that defendants could discover the plaintiffs' theory of damages. The summary of Felton's testimony filed by the plaintiffs on May 6, 1977, was found by the court not to be in compliance with its previous orders requiring a specific and detailed summary. The court declined to preclude the testimony of Felton, but allowed defendants an opportunity to depose him prior to his testifying at trial. The defendants deposed Felton on June 22, 1977, during a recess in the trial, but he had not yet arrived at any final opinions or prepared the exhibits which he intended to use at trial. At this point defendants again moved for preclusion of Felton's testimony. The district court denied this motion but ordered Felton to submit to a second deposition and required plaintiffs to reimburse defendants for their reasonable expenses in conducting the second deposition. In light of the above circumstances the district court acted within its discretion in assessing the plaintiffs $1,000 under Fed.R.Civ.P. 37(b)(2).
 
 
 95
 The final issue raised on this appeal is whether the district court abused its discretion in including in the taxation of costs against the plaintiffs $10,698.33 for daily copy of the trial transcript and $24.10 for service of a subpoena on Alfred Corbino. Upon review of the circumstances disclosed in this case, plaintiffs-appellants should not have been taxed for costs of daily transcript. The taxation to plaintiffs of the cost for service of the subpoena duces tecum on Corbino was justified because it was not known at that time that the trial court would ultimately preclude him from testifying and the subpoena was apparently the only means by which the defendants could obtain access to the documents needed to prepare for cross-examination.
 
 
 96
 After a careful review of the voluminous record in this case we are convinced that the district court properly granted Central States' motion for summary judgment and the motions for directed verdict by the other defendants.
 
 
 97
 Affirmed, subject to modification striking costs of daily transcript.
 
 
 
 *
 The Honorable Joe M. Ingraham, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * * ."
 Section 2 of the Sherman Act, 15 U.S.C. § 2, provides in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States * * * shall be deemed guilty of a felony * * * ." The section 2 claim has not been pressed on appeal.
 Jurisdiction is predicated upon sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.
 
 
 [2]
 The Honorable William C. Hanson, Chief Judge, United States District Court for the Southern District of Iowa, sitting by designation in the District of Nebraska
 
 
 [3]
 The distributor-defendants are Universal Pictures, Paramount Pictures, Warner Brothers Distributing Corporation, Columbia Pictures Industries, Inc., Allied Artists Pictures Corporation, Twentieth Century Fox Film Corporation and Avco Embassy Pictures Corporation
 
 
 [4]
 The exhibitor-defendants are The Douglas Theatre Company, J.S.B. Amusement Corporation of Nebraska, American Multi-Cinema, Inc., Cooper Theatres, Inc., Mann Theatres Corporation of California and Central States Theatre Corporation. The individual exhibitor-defendants are Russell Brehm, Irwin Dubinsky, Sarge Dubinsky, Stanley Durwood, Elwood Thompson, Herman Hallberg, Theodore Mann, Myron Blank and Arthur Stein, Jr
 
 
 [5]
 Ralph Blank was chief operating officer for all three theatres. Upon his death in 1976 his son, Robert, became the principal operating officer for the Admiral and the Skyview theatres. The Chief Theatre had closed in 1972. Robert Blank was the plaintiffs' principal witness at trial
 
 
 [6]
 These figures are approximate because some of the theatres were in business during only part of the relevant period. Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1275-76
 
 
 [7]
 There is nothing inherently illegal or improper about moveovers. Ayers v. Pastime Amusement Co., 283 F.Supp. 773, 789 (D.S.C.1968); Robbinsdale Amusement Corp. v. Warner Bros. Pictures Distrib. Corp., 141 F.Supp. 134 (D.Minn.1955), Dismissed on stipulation, 235 F.2d 782 (8th Cir. 1956). Moveovers were of little value to the plaintiffs because of the number and physical structure of their theatres. Some of the exhibitor-defendants suffered from these same limitations. This did not preclude the distributors from allowing moveovers to those exhibitors who were capable of using them to their advantage. There was no evidence that moveovers were granted discriminatorily to benefit the exhibitor-defendants
 
 
 [8]
 Blank was allowed to testify concerning one late bid subsequent to the relevant time period which was summarily rejected. There was no claim that this late bid was superior to the bid accepted
 
 
 [9]
 The district court found that by the summer of 1974 the Astro, which was owned by exhibitor-defendant J.S.B., and the plaintiffs' Admiral Theatre, were the only viable first-run downtown theatres. Exhibitor-defendant Cooper Theatres had sold the Dundee in March of 1974 and closed the Cooper 70 in June of that year. Exhibitor ABC Midwest had also closed the Orpheum. The plaintiffs' Chief Theatre, which closed in December 1972, was located in a commercial area approximately three miles from the center of downtown Omaha. The closing of downtown theatres was offset by the construction of several theatres with multiple screens in the western sections of Omaha
 
 
 [10]
 The court's May 11, 1977, grant of summary judgment in favor of Central States was supplemented by an order of May 17, 1977, to include a judgment in favor of defendants Myron N. Blank and Arthur Stein, Jr., officers of Central States
 
 
 [11]
 Plaintiffs use the term "first-run" in their complaint to indicate the type of films which the defendants split. Evidence in the record reveals that the terms "first-run-drive-in" and "first drive-in-run" have a different meaning than the term "first-run." These terms may refer to films which have already been shown in indoor theatres and are then released for the first time in drive-ins, or to those films which are initially released for simultaneous indoor and drive-in runs. Evidence in the record discloses that drive-in theatres do a somewhat different type of business than indoor theatres. Those films which debut simultaneously in both types of theatres are generally not of the quality associated with major motion pictures. See Admiral Theatre Corp. v. Douglas Theatre Co., supra, 437 F.Supp. at 1296
 
 
 [12]
 Fed.R.Civ.P. 59(e) provides:
 Motion to Alter or Amend a Judgment. A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.
 
 
 [13]
 The Court in Topco said:
 One of the classic examples of a Per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Such concerted action is usually termed a "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, E. g., manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that "(h)orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition." (Citation omitted.) Such limitations are Per se violations of the Sherman Act.
 United States v. Topco Assocs., supra, 405 U.S. at 608, 92 S.Ct. at 1133.
 
 
 [14]
 This case provides an excellent discussion of the "demand prerequisite."
 
 
 [15]
 The following statements by Felton are illustrative:
 THE COURT: The question the Court wants to know from you, Mr. Felton, is are you testifying as an expert, or are you testifying what are you testifying as?
 (DR. FELTON): I am not testifying as an expert on theatre quality. I have no ability to testify as an expert on that. All I would say with respect to this is that on the basis of Richard and Robert Blank's statements with respect to the characteristics which they believe were important
 (DR. FELTON): Now, I did not consider the Astro and Dundee comparison with the Admiral to be so unreasonable that it would negate any subsequent efforts that I might make at utilizing this for the basis for determining the existence of injury and the computation of damages.
 (DR. FELTON): I am not testifying as an expert on the relative quality of the Astro, Dundee and Admiral. That, I lack the capacity to do.
 
 
 [16]
 Felton testified as follows:
 Q. * * * this is the amount of the damages you calculated on the part of the Admiral Theatre, $151,085, right?
 A. (Felton) That is correct.
 Q. Is that a conservative figure?
 A. I think it is a very realistic figure. It follows directly from the method of comparability. The theory is, of course, as we indicated earlier, that if the two theatres are comparable, and if they were to enjoy opportunity for access to the same film, then presumably their net receipts the net receipts for the Admiral should have been equal to the average of the Dundee and Astro. The fact that they fell short of that by a significant margin is, in my judgment, an appropriate measure of the damage sustained by the Admiral during the relevant time period.
 
 
 [17]
 See also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 88 (9th Cir. 1969), Cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), where the court noted that "something more than gross figures was required to show the fact of damage, I. e., that the loss was Caused by the termination."
 
 
 [18]
 This ruling of the district court is in accord with established law that plaintiffs are entitled to damages only on films upon which they made specific unsuccessful demands in the absence of proof that demand was futile. See, e. g., Dahl, Inc. v. Roy Cooper Co., supra, 448 F.2d at 19; Royster Drive-In Theatres v. American Broadcasting-Paramount Theatres, Inc., supra, 268 F.2d at 251. See generally Part III B, Supra