# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 97-4055/4223
_____

| | | |
|---|---|---|
| St. Louis Convention & Visitors Commission, | * | |
| | * | |
| | * | |
| Plaintiff - Appellant/ | * | |
| Cross - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| National Football League; B & B | * | |
| Holdings, Inc.; The Five Smiths, Inc.; | * | |
| Buffalo Bills, Inc.; Chicago Bears | * | |
| Football Club, Inc.; Cleveland Browns | * | |
| Football Company, Inc.; Dallas | * | |
| Cowboys Football Club, Ltd.; PBD | * | |
| Sports, LTD; The Detroit Lions, Inc.; | * | |
| The Green Bay Packers, Inc; Houston | * | Appeals from the United States District |
| Oilers, Inc.; Indianapolis Colts, Inc.; | * | Court for the Eastern District of |
| Kansas City Chiefs Football Club, Inc.; | * | Missouri. |
| Miami Dolphins, Ltd.; Minnesota | * | |
| Vikings Football Club, Inc.; New | * | |
| England Patriots, Limited Partnership; | * | |
| The New Orleans Saints; New York | * | |
| Football Giants, Inc.; New York Jets | * | |
| Football Club, Inc.; Philadelphia Eagles | * | |
| Holdings, L.P.; Pittsburgh Steelers | * | |
| Sports, Inc.; Chargers Football | * | |
| Company; San Francisco Forty-Niners, | * | |
| Limited; Seattle Seahawks, Inc.; Pro- | * | |
| Football Inc., | * | |
| | * | |
| Defendants - Appellees/ | * | |

Cross - Appellant.                     *

_____


Submitted: June 10, 1998
Filed: September 3, 1998

_____


Before WOLLMAN and MURPHY, Circuit Judges, and KYLE,[1] District Judge.

_____

MURPHY, Circuit Judge.

After St. Louis lost its professional football team to Phoenix in 1988, extensive efforts began to obtain another team and resulted in the successful relocation of the Los Angeles Rams in 1995. Many millions of dollars were spent in order to accomplish the relocation, and the St. Louis Convention and Visitors Center (CVC) sued the National Football League and twenty four of its member teams (collectively the NFL) alleging that these expenditures were made necessary by actions of the NFL in violation of antitrust and tort law. The case was tried before a jury for over four weeks before it ended in a judgment in favor of the NFL. CVC appeals the dismissal of its claim for Sherman Act conspiracy and tortious interference with contract. The NFL cross appeals the refusal of the district court [2] to rule that the league and the member teams do not amount to a single entity for antitrust purposes. We affirm the judgment.

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

# I.

## A.

The move of the St. Louis Cardinals football team to Phoenix in 1988 caused the Missouri state legislature, the city of St. Louis and the surrounding county to undertake to find a replacement by the beginning of the 1995 season. The legislature assigned the effort to procure a team to CVC, a body previously created by the Missouri legislature and empowered to promote the convention and tourism business in St. Louis. See Mo. St. Ann. §§ 67.601, 67.607. The initial goal was to obtain one of the two NFL expansion franchises to be established in 1993. In order to attract a team the city resolved to build a convention center in downtown St. Louis called America's Center which would include a new football stadium. The football stadium was called the Trans World Dome, and its $258 million cost was paid from state and local government funds. The stadium lease was assigned to CVC which became its manager and initially subleased the right to present football in the dome to private parties.

Problems associated with control over the lease and the potential ownership group caused St. Louis to be passed over in the NFL's expansion voting. The new franchises were awarded to Jacksonville, Florida and Charlotte, North Carolina. This forced the St. Louis football enthusiasts to adopt another strategy, and they turned their attention toward attracting an existing team. They founded a civic organization called FANS, Inc. (Football at the New Stadium), to assist their efforts. FANS, acting on behalf of CVC, then approached the Los Angeles Rams and began to negotiate a deal for the team to move to St. Louis. As a result a written agreement was eventually signed by CVC and the Rams.

The NFL League Constitution and Bylaws require a favorable vote by three fourths of the team owners to permit relocation, and the proposal for the Rams to move

was initially voted down by the owners. It was later approved after the Rams agreed to pay the NFL a $29 million relocation fee. CVC eventually agreed with the Rams to pay $20 million of this fee, despite a clause in their contract allowing CVC to cancel if the fee were to exceed $7.5 million.

The Rams began playing in St. Louis in 1995, and in that year CVC was unable to make some of the payments owed to the team. CVC then brought this suit against the league and twenty four of its member teams. It also made an agreement with the Rams that they would receive half of any recovery obtained in the case in return for forgiveness of the money CVC owed them. The theory CVC presented at trial was that the league's relocation rules and the way they had been applied had created an atmosphere in which teams were unwilling to relocate. It contended that this anti-relocation atmosphere had discouraged interested teams from bidding on the St. Louis lease. The result was a one buyer market which forced the CVC to give more favorable lease terms than it would have in a competitive market.

**B.**

The league was formed in 1966 by a union of the American Football League and the National Football League, and it functions as the governing body of a joint venture of thirty professional football teams producing "NFL football." The teams are independently owned and managed by different business interests. The league is organized through the League Constitution and Bylaws, an agreement among team members that sets out rules for league management of matters such as game rules, game schedules, team ownership, and location of teams. Most decisions affecting the league are made by vote of team representatives at NFL meetings. When NFL members decided to create two new team franchises for 1993, representatives from various cities made presentations to team owners in order to win a franchise.

St. Louis political leaders and business people were among those who made presentations to the league, and they emphasized the benefits an NFL team could expect from the stadium lease and the city. But there were problems with the St. Louis application for a team. At the time of the expansion decisions the exclusive right to use the Trans World Dome for professional football games was held by St. Louis NFL, Inc., which was controlled by two St. Louis businessmen, Jerry Clinton who owned one third and Jim Orthwein who owned the remaining two thirds. The fact that rights to lease the stadium for football were held by individuals who were unrelated to CVC caused the owners to pass over St. Louis as the site of an expansion team.

CVC's next option was to arrange for an existing team to leave its home city and relocate to St. Louis. Community members formed the civic organization FANS, Inc. in January of 1994, headed by former Senator Thomas Eagleton, to accomplish the task which they were increasingly anxious to complete. Around this time Congressman Richard Gephardt alerted FANS that the Los Angeles Rams were considering relocating from their stadium in Anaheim, California. He had seen a newspaper report that the Rams were discussing a possible move to Baltimore, Maryland. Congressman Gephardt concluded that since Baltimore had been one of St. Louis' main competitors during the expansion process, the city should follow Baltimore's lead and approach the Rams. FANS then contacted John Shaw, the Rams president, and began negotiations on a relocation agreement and stadium lease. During this period, St. Louis was competing with Hartford and Anaheim in addition to Baltimore.

FANS made an initial presentation to the Rams, but talks ended because of problems with Clinton and Orthwein having control over the lease and because FANS had leaked information about the negotiations to the press, including the Rams' list of features it desired in a new stadium (the "wish list"). Discussions resumed only after CVC gained control over the lease, and the Rams told CVC that they would discontinue any business dealings if the CVC approached any other team about moving to St. Louis. CVC never contacted any other team to solicit a bid on the lease. CVC

considered it the better course to focus on only one team, and it believed its presentation during the expansion process should have been sufficient to stimulate the interest of other teams.

The Rams and CVC eventually agreed on a lease. The Rams agreed to pay to CVC $25,000 rent per game, plus half of the game day expenses. In return the Rams would receive all of the ticket revenue from Rams games, 75% of the first $6 million in advertising revenue and 90% of the remainder, 100% of the profit from the concessions at Rams games and a portion of the concessions profit from other events. Rams president John Shaw estimated the lease would produce approximately $40 million per season in revenue for the Rams. CVC agreed to a number of other obligations, including promises to pay $28 million to fulfill bond obligations which the Rams owed on Anaheim Stadium, to build a $9.9 million training facility for the team, and to pay the team's moving costs. Once the Rams and CVC reached their agreement, the Rams presented their relocation application to the league owners for approval in March, 1995.

## C.

Relocation decisions by the NFL come under Article 4.3 of the league constitution which provides that "[n]o member club shall have the right to transfer its franchise or playing site to a different city, either within or outside its home territory, without prior approval by the affirmative vote of three-fourths of the existing member clubs of the league." While not expressed in the governing documents, the league claims the right to assess a relocation fee on any team seeking to move. At the time CVC was dealing with the Rams, the NFL had levied one previous relocation fee; the Cardinals had been assessed $7.5 million for their move to Phoenix.

After a successful antitrust challenge to an application of Article 4.3 to the relocation of the Oakland Raiders to Los Angeles, see Los Angeles Memorial Coliseum

-6-

Comm'n v. NFL, 726 F.2d 1381 (9th Cir. 1984) (Raiders I),[3] the NFL commissioner had issued procedures for obtaining league approval of any proposed relocation and nine non-exclusive factors (the guidelines)[4] that team owners should consider in deciding how to vote on a move. No guidelines have been promulgated on the imposition or computation of a relocation fee. Under the rules in effect at the time of the Rams move, a NFL team which wanted to move would negotiate a lease and relocation agreement with its new landlord and then apply to the league for permission to relocate. Only the moving team participated in the NFL application process; the new landlord had no direct involvement.

Owners voted down the initial application by the Rams because of disagreements between the league and the team on several of the relocation terms, including payment of a relocation fee, sharing of revenues from the sale of "personal seat licenses" (options to purchase tickets), and possible indemnification of the league for television payments it might owe as a consequence of the move. After the initial league vote, and in anticipation of the assessment of a relocation fee, CVC agreed with the Rams it would pay up to $7.5 million of any fee. Either party had the right to void the agreement should the fee exceed that amount

---

[3]In Raiders I the Ninth Circuit held that Article 4.3 had impermissibly foreclosed competition between stadia seeking NFL tenants and granted exclusive territories to NFL teams. 726 F.2d at 1395. Future applications of the rule could withstand scrutiny, however, if the NFL adopted objective factors for consideration by team owners before voting, as well as clarified procedures including an opportunity for any applicant to make a presentation to the league. Id. at 1397. The NFL commissioner subsequently issued such guidelines. CVC complains that the guidelines and the rule have had the effect of discouraging competitive bidding for available stadia, thereby driving up the cost for a locality seeking a team.

[4]These factors include consideration of the adequacy of the team's current stadium, the extent of demonstrated fan support for the team, and the extent to which the owner has contributed to the need for relocation.

The Rams and the NFL reentered negotiations, and the NFL commissioner said that the relocation could be approved if the Rams would pay a higher fee. The NFL had "the right to assess whatever fee they thought necessary" since the initial relocation proposal had not satisfied the league guidelines. The Rams then agreed to pay a $29 million relocation fee,[5] to forgo any share in the next two relocation fees levied by the league, to share $17 million in personal seat license revenue with the NFL, and to indemnify the league for up to $12.5 million of any extra expenses arising from the league's television contract. The Rams relocation was approved on April 12, 1995.

The agreement between CVC and the Rams about CVC's obligating itself on any relocation fee was not revealed to the NFL owners during these negotiations, and it does not appear that the owners were informed about it until after the April 12 vote.[6] Following the vote, the Rams and CVC once again entered negotiations, this time on how the charges assessed by the NFL on the Rams would be paid. The parties agreed in June of 1995 that CVC would pay $20 million of the relocation fee and that CVC would be directly liable to the NFL for its payment. CVC did not exercise the agreement's escape clause, and the Rams began playing in St. Louis in 1995. During that year CVC experienced difficulties meeting its financial obligations to the Rams and did not pay approximately $14 million of the amount due. CVC and Rams president

---

[5]The relocation fee was described by the commissioner as reflecting among other things the increased value of the team after the move to St. Louis and the value of that franchise opportunity compared to Anaheim.

[6]The record is not clear on when the NFL owners learned about CVC's agreement to contribute to any relocation fee. John Shaw testified that he informed Commissioner Tagliabue of the agreement before the April 12 vote, but on cross he said that he had withheld information about the agreement from the NFL and team owners and had insisted that CVC do the same. Tagliabue testified that he did not inform the owners about CVC's undertaking in regard to the fee until after they had voted.

-8-

Shaw then agreed that CVC would sue the NFL and that the Rams would receive a right to half of any recovery in place of the payments due.

## II.

### A.

CVC filed this case against the league and twenty four member teams on December 18, 1995, claiming that their actions had violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and that the imposition of the high relocation fee tortiously interfered with CVC's contract with the Rams. CVC's theory was that Article 4.3, the accompanying guidelines, and their application over time functioned as an agreement among the league and the individual teams to restrain relocations, creating an atmosphere which deterred teams from moving and therefore from bidding on the Trans World Dome lease. It contended that the Rams were the only team willing to take the risk of an attempted relocation so they were the only bidder on the lease. As a consequence the Rams were able to obtain very favorable terms from CVC which caused it to lose between $77 and $122 million. CVC requested damages under the Clayton Act which, if established, would be trebled to between $241 and $366 million, and attorney fees. See 15 U.S.C. § 15. The tortious interference claim was based on the theory that the $29 million relocation fee assessed on the Rams was levied through economic duress, since its only choices were to agree to increase its share of the fee from $7.5 million to $20 million or abandon the deal with the Rams. It asserted that the fee made its contract with the Rams substantially more burdensome which constituted tortious interference under Missouri law, as did the use of economic duress.

### B.

A number of motions were brought during the pretrial period, including one by the NFL for summary judgment on the Section 1 claim. The NFL argued that the

league and teams form a single economic enterprise incapable of conspiring among themselves. The court denied the motion on the basis of collateral estoppel. The Ninth Circuit had previously ruled against the NFL on the same issue in Raiders I, 726 F.2d at 1387-90 (league not a single economic enterprise because teams have independent value, are separately owned and managed, earn different profits, and compete in various ways). The district court was not persuaded that two subsequent cases dealing with the concept of single economic enterprise required a different result. Copperweld Corp v. Independence Tube Corp., 467 U.S. 752 (1984) (parent and wholly owned subsidiary cannot conspire with each other under Section 1) and City of Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 274-76 (8th Cir. 1988) (test is whether entities have "pursued interests diverse from those of the cooperative itself"). See White Earth Band of Chippewa Indians v. Alexander, 683 F.2d 1129, 1134 (8th Cir. 1982) (change in law required to prevent collateral estoppel).

In a second summary judgment motion the NFL argued for dismissal of all of CVC's claims. The district court granted the motion as to the Missouri antitrust claims on the basis that they were preempted by federal law, citing Partee v. San Diego Chargers Football Co., 668 P.2d 674 (Cal. 1983) (en banc), and denied it in all other respects. The remaining issues for trial were discussed in some detail in the course of its ruling.

The court's discussion of the Section 1 claim gave direction on several legal points. It indicated that CVC could not succeed on this antitrust claim with a theory that Article 4.3 was per se anticompetitive, but instead would have to show that the alleged anticompetitive effect of the rule outweighed its procompetitive features. The court relied on National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma, 468 U.S. 85, 100-103 (1984) (NCAA) (league limits on number of televised games), and Raiders I, 726 F.2d at 1387 (league rule requiring vote to allow a team to relocate). These cases had held that certain rules of sports leagues governing matters such as the number of games to be televised and the division of home territories among

-10-

professional teams, while perhaps ordinarily per se anticompetitive, were necessary for the existence of the league and should therefore be judged under a rule of reason analysis. CVC would also have to offer proof that the alleged conspiracy to suppress movement of teams in fact caused the absence of competing bids on the Trans World Dome lease before a jury would be permitted to decide whether harm to competition from Article 4.3 and its enforcement outweighed the positive effects on competition. See NCAA, 468 U.S. at 100; Chicago Board of Trade v. United States, 246 U.S. 231, 238 (1918). This was because CVC's claim was unlike cases alleging damage from a direct application of a regulation, see Raiders I, 726 F.2d at 1384-85 (case arose from owners' vote against relocation under Article 4.3 which required approval for a move). There was nothing in the NFL Constitution and Bylaws or in the deposition evidence to suggest that there was an explicit ban or limit on competitive bidding for leases.

The court also denied summary judgment on CVC's Section 2 and tortious interference claims. It held that CVC could make out a Section 2 monopoly leveraging claim if it could show that the NFL used a monopoly position in the professional football market to gain an advantage in the market for stadia. More evidence was necessary in order to evaluate the NFL's claim that the stadium market was not distinct from the market for professional football. The court determined that there were questions of material fact on the tortious interference claim. These included whether CVC's renegotiation of its lease agreement with the Rams was a necessary consequence of enforcement of Article 4.3 and whether the NFL intended to interfere with that contract. With the case focused on these issues, the parties went to trial.

## C.

CVC's case consisted largely of the testimony of various owners, league commissioner Paul Tagliabue, Rams president John Shaw, and several experts. It also presented testimony of individuals involved in the Rams relocation to St. Louis. FANS leader Senator Eagleton, Congressman Gephardt, and St. Louis County Executive

George Westfall all testified about their involvement in the relocation and the interaction with NFL officials. CVC focuses in this appeal on three bodies of evidence.

CVC attempted to show that past applications of Article 4.3 and the related guidelines and the NFL approach to team relocations had created an atmosphere in which teams were afraid to move and that they did not bid on CVC's lease as a result. Several team owners stated in deposition testimony that the purpose of the rules was to ensure stability, and they also testified to differing interpretations of the guidelines and of their relative importance in deciding how to vote. CVC argued that this evidence showed teams could anticipate league disapproval of any moves or use of the rules to extract concessions upon relocating and that teams would therefore not seek out and bid on opportunities to move. Leonard Tose, the former owner of the Philadelphia Eagles, testified that the NFL had sued to stop the Eagles from moving to Phoenix and taken actions which CVC claims necessitated sale of the team. Victor Kiam, the former owner of the New England Patriots, also testified about the attempt to relocate his team, which met with resistance and a forced sale.

CVC claims that the uncertainty about imposition of a relocation fee and its amount was one reason why teams did not seek out relocation opportunities. The league had assessed a relocation fee of $7.5 million on the St. Louis Cardinals when the team moved to Phoenix in the first team relocation after the guidelines were issued. CVC offered evidence on the benefits a predictable formula for calculating the fee would have and pointed out that the NFL has not adopted one.

CVC called Rams president John Shaw in its case in chief. He explained during his testimony that the Rams would obtain a portion of any recovery in this case. Shaw testified about the negotiations between the Rams and CVC and about the Rams' dealings with the NFL during the voting on the relocation proposal. In addition to testifying about the Rams interest in relocating and their negotiations with CVC, he also discussed his own experience with the league and his views about other teams. Shaw

testified that based on his experience representing the Rams at league meetings Article 4.3 prevented team movement, that the NFL took an antagonistic approach toward relocations, and that there were high risks of alienating the league or possible penalties in any attempt to move a NFL team. The Rams benefitted in their negotiations with CVC because no other team was bidding as a result of Article 4.3 and its application, and this enabled him to demand a more favorable lease from CVC than he would have been able to get in a competitive environment.

Among the experts called by CVC was Professor John Siegfried, an economics professor at Vanderbilt University who has done research on the economics of sports. Siegfried said that in his opinion the relocation policies had a direct effect on the lease price. He testified that any team which challenged the regulations would be the only bidder on an available lease (in antitrust terms, a "monopsony") and could therefore extract favorable terms from the captive buyer. In a "freely competitive marketplace with full dissemination of information" he would expect teams to seek out the best lease opportunities and to bid against each other on them. He based his conclusions on "observed market behavior" and the "prospect of earning higher returns at the Trans World Dome."

CVC also used circumstantial evidence to support its argument that the NFL culture caused the lack of bidding on its lease. CVC argued that the purpose of the NFL rules was to deter relocation and that they accomplished that purpose and prevented other teams from bidding on the lease. It claimed that the market would normally produce competition for a lucrative lease, and offered the testimony of Stanley "Bud" Adams, Jr., owner of the Houston Oilers football team, who stated he would have expected high competition for the lease. CVC contends in its brief that from this evidence "a reasonable jury could infer that some external factor was disrupting free competition -- and that a set of relocation policies designed and intended to frustrate team movement were the most likely candidate."

**D.**

The NFL moved for judgment as a matter of law at the close of CVC's case, after four weeks of evidence, and the district court granted the motion as to two of CVC's three remaining claims. The court found that CVC had failed to present evidence that the relocation fee caused a breach in its lease agreement with the Rams, and breach is a necessary element of tortious interference under Missouri law. CVC instead modified its agreement with the Rams to accommodate the size of the fee. The court also found that there had been no evidence that the NFL had intended to interfere with the contract, another required element under state law. Judgment was granted in the NFL's favor on the Section 2 claim as well, since CVC had not shown that the NFL had a monopoly in the professional football market or that there was a secondary market in NFL stadia. CVC has not appealed the ruling on the Section 2 claim. The court permitted the Section 1 claim to proceed, despite expressing misgivings about CVC's case.

After the NFL had presented two days of evidence and was close to finishing its case, the court convened the charge conference to prepare for submission of the Section 1 claim to the jury. The parties again disagreed about whether CVC could make a submissible case by showing that the NFL's rules and actions must have been what had prevented other teams from bidding on the Trans World Dome lease, as opposed to showing that there had been a connection in fact between the allegedly anticompetitive behavior and the absence of competitive bidding. CVC was asked to explain its Section 1 theory at the conference. Counsel responded that "this application and enforcement of the relocation policies had a very substantial deterrent effect upon anybody but the Rams entering into negotiations with CVC." At this point the NFL moved again for judgment as a matter of law, see Fed. R. Civ. P. 50(a). It argued that without a showing that the NFL's rules and actions had in fact deterred bidding on the St. Louis lease, CVC's claim was in essence a per se attack on Article 4.3 and the

-14-

guidelines, and the court had already indicated that the rule of reason was the proper method of analysis.

After further briefing and oral argument, the court described the critical question as whether there was evidence tending to show that "the alleged restraint arises out of 'the agreement of the teams to adopt Article 4.3 to empower the commissioner to adopt and promulgate rules in enforcing 4.3 which has resulted in conduct which has precluded teams from coming to bid competitively in St. Louis.'"  In other words, in order to go to the jury CVC had to show more than a theoretical connection between the allegedly anticompetitive actions and the events surrounding the Rams move to St. Louis.

Since the court concluded that CVC had presented no evidence to show that the NFL's rule and the guidelines actually had caused league teams other than the Rams to refrain from competitive bidding on the Trans World Dome lease, it granted the Rule 50 motion.  CVC had not shown that it had either tried to learn if other teams might be interested in relocating, that there were teams actually interested in moving to St. Louis, or that the failure of the others to bid on the lease was due to the NFL's policies and acts.  There was no showing that there had been interested teams who had failed to contact CVC or that at the time CVC was seeking a team there were team owners who had not bid because of past application of league rules or acts of the commissioner to stop relocations.  Finally, the court held that CVC had failed to present evidence of antitrust injury.  It said there had been no evidence that collusive activity of the league and member teams reduced competitive bidding and that the opinion testimony of CVC's expert on damages lacked foundation in the record and was not consistent with its theory of liability.

**III.**

CVC's appeal from the judgment focuses on the dismissal of its claim under Section 1 of the Sherman Act and of its claim for tortious interference with contract. It seeks a new trial. CVC argues that its evidence was sufficient to establish a Section 1 violation, contending that it had shown a connection in fact between the NFL rules and actions and the lack of competitive bidding on the lease. It also argues that the tortious interference claim should not have been dismissed because it had established both economic duress and actions which made its agreement with the Rams more burdensome. The NFL responds that CVC did not produce sufficient evidence and no evidence that it sought bids from other teams or that other teams were even in a position to move. The league and teams also suggest that Article 4.3 and the related guidelines could not have affected the number of bidders on the lease because the rules did not become relevant until after the agreement between the Rams and CVC was completed and the Rams made their application to move, in other words well after any bidding period. Finally, the NFL argues that CVC was unable to show there were not independent reasons for the absence of other bids, especially since other owners did not know that the St. Louis lease problems which surfaced during the expansion period had been corrected or that certain acts alleged to have been taken by the commissioner to prevent team relocation had occurred.

The league and teams also cross appeal. They challenge the district court ruling that they were collaterally estopped from arguing that they are a single economic enterprise incapable of conspiracy under Section 1 of the Sherman Act. They contend that the Supreme Court decision in <u>Copperweld Corp.</u>, 467 U.S. 752, and this court's decision in <u>City of Mt. Pleasant</u>, 838 F.2d 268, have changed the law on single economic enterprise since the Ninth Circuit decision in <u>Raiders I</u>. They seek reversal of the collateral estoppel ruling and dismissal of CVC's Section 1 claim on the ground that they amount to a single economic enterprise.

**A.**

-16-

CVC claims that the district court failed to use the correct legal standard for Rule 50, which required it to "1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn." Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 830 (8th Cir. 1996) (quoting Pumps & Power Co. v. Southern States Indus. Inc., 787 F.2d 1252, 1258 (8th Cir. 1986) (cites omitted). CVC does not believe that the district court viewed the evidence in the light most favorable to it, particularly its evidence on causation. Since it presented enough evidence to survive the earlier motion for summary judgment and introduced more evidence at trial, the Rule 50 motion should have been denied and the case submitted to the jury.

The district court stated the correct legal standard at the time it granted the Rule 50 motion, and our review of the record does not lead to the conclusion that it failed to apply it. See Admiral Theatres v. Douglas Theatre, 585 F.2d 877, 883 (8th Cir. 1978). We review the grant of a motion for judgment as a matter of law de novo, using the same standard as the district court. Id. Although CVC claims that the court explicitly declined to consider its evidence of causation, the passages it cites in the district court opinion do not contain any such statement. Rather, the court explained in its opinion that even after weeks of trial it was not clear what legal theory CVC was proceeding with on its Section 1 claim. The court restated its consistent ruling that CVC would not be able to rely solely on the existence of the NFL rules to prove its case. That principle of law was not incorrect, and CVC does not point to any other example to support its argument that the court did not follow the standard.

The court's prior decision on summary judgment did not control the outcome of the Rule 50 motion. The Rule 50 motion was made and considered after the court had had the benefit of over four weeks of trial. It had heard the testimony of many witnesses and received numerous exhibits. There had been the opportunity for

-17-

extensive legal arguments by the parties. At the time of the summary judgment motion it had been even less clear what CVC's precise legal theory was and what its evidence would be. By the time the district court ruled on the Rule 50 motion, it was able to review all the evidence in light of the legal discussions at the charge conference. It concluded that CVC had not met its burden. Given these facts and the posture of the case, the court was not required to reject the Rule 50 motion because of its earlier order on summary judgment.

**B.**

CVC contends that its evidence was sufficient to withstand a Rule 50 motion. CVC says that the testimony of John Shaw and Professor Siegfried, together with circumstantial evidence, tended to show that actions by the NFL caused the lack of bidding and the damages it seeks. The NFL replies that none of the evidence shows that the NFL policies, or their implementation, had the actual effect of deterring any team from making a bid on the stadium lease.

We review the decision to grant judgment as a matter of law de novo, which is appropriate where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed. R. Civ. P. 50(a)(1); see also Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 435 (8th Cir. 1998). Although the plaintiff is awarded the benefit of all reasonable inferences, it is not given "the benefit of unreasonable inferences or those at war with the undisputed facts." Sip-Top, 86 F.3d at 830 (quoting Marcoux v. Van Wyk, 572 F.2d 651, 653 (8th Cir. 1978)) (internal quotations and citations omitted). "Where the record contains no proof beyond speculation to support the verdict, judgment as a matter of law is appropriate." Id.

Section 1 of the Sherman Antitrust act makes it unlawful to form a conspiracy in restraint of trade. 15 U.S.C. § 1. Restraints which have "pernicious effect on

competition and lack of any redeeming virtue" are illegal per se under Section 1 without inquiry into the reasonableness of the restraint or the harm caused. Northern Pac. Rw'y v. United States, 356 U.S. 1, 5 (1958); see also Copperweld Corp., 467 U.S. at 768; United States v. Topco Associates, Inc., 405 U.S. 596, 607-08 (1972). Analysis of whether a restriction's harm to competition outweighs any procompetitive effects is necessary if the anticompetitive impact of a restraint is less clear or the restraint is necessary for a product to exist at all. See Chicago Board of Trade, 468 U.S. at 238; Broadcast Music, Inc. v. Columbia Broadcast Sys., Inc., 441 U.S. 1, 9-10 (1979). Some trade restrictions by sports leagues have been held to fall into this category. NCAA, 468 U.S. at 94 (restriction on broadcasts of league games); NBA v. SDC Basketball Club, Inc., 815 F.2d 562, 567-68 (9th Cir. 1987) (relocation rules); Sullivan v. NFL, 34 F.3d 1091, 1096 (1st Cir. 1994) (prohibition of public ownership of teams). The district court held in this case that the franchise relocation rule and guidelines for evaluation of proposed team moves do not fit the per se category of restraints and should therefore be addressed under a rule of reason analysis. This ruling has not been appealed.

## 1.

In order to prevail under Section 1, CVC must prove that: (1) there was an agreement among the league and member teams in restraint of trade; (2) it was injured as a direct and proximate result; and (3) its damages are capable of ascertainment and not speculative. Admiral Theatre Corp. v. Douglas Theatre Corp., 585 F.2d 877, 883-84 (8th Cir. 1978). The first element is established by proof that there was an agreement in restraint of trade and that the challenged action was "part of or pursuant to that agreement." Monsanto v. Spray-Rite Service Corp., 465 U.S. 752, 767 (1984). Other Section 1 challenges to rules of sports leagues have involved situations where the defendants had taken action pursuant to an allegedly anticompetitive rule and the plaintiff attacked the rule itself or the application of the rule. See NCAA, 468 U.S. at 100-101 ; Sullivan, 34 F.3d 1091; SDC Basketball Club., 815 F.2d 562. In those cases

there was no question that the defendants were acting pursuant to an agreement in restraint of trade, and the issue was whether the agreement was unreasonable.  See id. This case is different because CVC has not challenged a vote by team owners or a particular application of the rules, see Raiders I, 726 F.2d at 1385, nor was St. Louis unable to obtain a NFL team.   CVC complains instead about market conditions and attributes the conditions existing at the time it was seeking a tenant to an atmosphere created by the rules and the handling of prior relocations.

CVC did not present evidence tending to show that there was even one other team besides the Rams that failed to bid on its lease because of the NFL rules and past applications of them.  See Monsanto, 465 U.S. at 764.  In order to prove that Section 1 defendants were acting pursuant to a conspiracy, a plaintiff must present evidence that tends "to exclude the possibility that the alleged coconspirators acted independently," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 585 (quoting Monsanto, 465 U.S. at 764), because "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy," The Corner Pocket of Sioux Falls, Inc. v. Video Lottery Technologies, Inc., 123 F.3d 1107, 1109 (8th Cir. 1997), cert. denied 118 S.Ct. 1054 (1998) (quoting Matsushita, 475 U.S. 574, 588 (1986)).  See also Monsanto, 465 U.S. at 764 (1984); Lovett v. General Motors Corp., 998 F.2d 575, 578-79 (8th Cir. 1993).[7]

---

[7]The cited cases involved situations which could amount to a per se violation of the antitrust laws.  In a rule of reason case like this one, where there is an issue as to the cause of the lack of competitive bidding, evidence about whether the alleged agreement affected the actions of the other team owners is relevant, as is evidence tending to exclude independent action.

CVC presented no evidence to exclude the possibility that the owners who did not bid on the St. Louis lease were acting for independent business reasons rather than pursuant to the alleged agreement in restraint of trade. Indeed, the evidence at trial was

to the contrary. The deposition testimony of the owners reflected their awareness of problems with the St. Louis lease, concern for their existing leases, and loyalty to their communities. These were all independent reasons why teams might not have bid. Moreover, CVC did not present evidence tending to show that all NFL teams would use the same criteria to evaluate a relocation opportunity or automatically attempt to move to the city offering the most lucrative lease. CVC argues that the parties' pretrial stipulation that the league Constitution and Bylaws amounted to an agreement among the NFL and its members was all that was necessary to show the existence of a conspiracy. This evidence did not tend to prove that any team acted pursuant to a conspiracy to prevent bidding on the stadium lease, however. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," and the trial evidence did not support an inference that NFL teams were acting pursuant to the alleged conspiracy when they declined to bid on the Trans World Dome lease. Matsushita, 475 U.S. at 588.

**2.**

The district court rested its summary judgment ruling on the issue of causation. In order to satisfy the causation element of a Section 1 case, CVC had to show that the NFL's anticompetitive acts were an actual, material cause of the alleged harm to competition. See National Association of Review Appraisers v. Appraisal Found., 64 F.3d 1130, 1135 (8th Cir. 1995); Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 883-84 (8th Cir. 1978). Since nothing in the NFL rules expressly prevented competition among teams for leases or stated that only one team could negotiate with a leaseholder at a time, CVC had to show that past suppression of movement and the alleged anti-relocation atmosphere created by previous rule applications effectively prevented all other teams from dealing with the CVC about the St. Louis lease and entering bids on it.

CVC argues that Shaw's testimony was sufficient to prove causation, but his testimony did not tend to prove that the rules deterred any interested owner from bidding in St. Louis or that other owners considered the rules a factor in their lack of interest in the lease. Shaw could not identify a single team that was expressly interested in moving to St. Louis or was prevented from bidding on the lease because of past applications of league relocation rules, and there was no additional evidence that any particular team was able to move at the time CVC was seeking a tenant.[8] In fact, CVC failed to ask any NFL owner whether they were interested in moving to St. Louis at the time it was seeking a team. Shaw was not a disinterested witness, and in the absence of other evidence his testimony was not enough to establish that the rule and its past application had created an anti-relocation atmosphere in the NFL which caused the lack of bidders, especially in light of the fact that Shaw's own team

---

[8]CVC claims that eight teams had expressed interest in moving since 1991, but the testimony it cites in support contains no indication that any team was interested in moving in 1995, CVC's deadline for a team. It cites the deposition testimony of New Orleans Saints owner Tom Benson who said that teams had expressed interest in St. Louis, but Benson did not identify any teams or the nature of any interest. CVC also does not cite any support elsewhere in the record for Shaw's testimony that the Houston Oilers, Cincinnati Bengals, and New England Patriots could move.

CVC argues that the Tampa Bay Buccaneers were available to move, citing the deposition testimony of a league official. That official stated, however, that the team would have had to pay a penalty on its lease in order to relocate, and CVC does not point to any testimony by team officials indicating they were prepared to move. Senator Eagleton testified, however, that Jerry Clinton had negotiated with the Buccaneers and claimed he could bring them to St. Louis on the same terms as the Rams if an additional $5 million were made available, but Eagleton did not indicate why St. Louis had not attempted to create a competitive bidding situation between the teams.

CVC also claims that the Minnesota Vikings were available, citing testimony by Senator Eagleton, but Eagleton testified that FANS concluded that the Vikings were not interested in St. Louis.

succeeded in moving after negotiating with several cities. See H & B Equipment Co. v. International Harvester Co., 577 F.2d 239, 247 (5th Cir. 1978) (plaintiff could not show causation based on corporate officer's testimony alone). Shaw was not a participant in what is alleged to have been a refusal to approach CVC, and his testimony on the motivation of other owners to refrain from bidding could not support a reasonable inference that the rules prevented the competitive bidding which CVC wished to have on the St. Louis stadium.

CVC contends that the testimony of its expert, Professor John Siegfried, establishes a causal link between the NFL's actions and the lack of competitive bidding on the lease. A jury may not rest its verdict on an expert's conclusion "without some underlying facts and reasons, or a logical inferential process to support the expert's opinion." Sullivan, 34 F.3d at 1105 (citing Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d 1333, 1339 (7th Cir. 1989)). Here, there was no evidence on which the jury could have drawn a logical inference from Siegfried's opinion. Siegfried testified that he would have expected to see bidding on the lease, but there was no evidence to support a finding that there were teams that were actually able and desiring to bid, but were prevented from doing it. Moreover, Siegfried rested his conclusions on economic theory that states that in a freely competitive market NFL teams would want to move to the most advantageous lease opportunity, but there was no evidence which tended to show that this was actually the case, especially in light of admissions by CVC witnesses that several team owners would not move because of loyalty to their communities or ownership of their stadia. Siegfried also testified that he had not seen any of the lease agreements involved in the case, any relocation agreement, or any documentation on the lease negotiations. Without evidence tending to show that Siegfried's economic model actually applied to the NFL and the CVC efforts to obtain a team, his testimony is insufficient to create a jury question on the issue of causation. Sip-Top, 86 F.3d at 830 (judgment as a matter of law appropriate where plaintiff only relies on speculation to support theory).

CVC relies also on circumstantial evidence to prove causation. It claims that since the purpose of the rules was to deter team movement and there was a lack of competitive bidding on the Trans World Dome lease, it can be inferred that the rules were the cause of the harm allegedly suffered. See Alexander v. National Farmers Org., 687 F.2d 1173, 1209-10 (8th Cir. 1982) ("causal links also may properly be a matter of inference from the circumstances and evidence as a whole."). CVC cites the Alexander case to support its position, but the facts there were significantly different. The plaintiff had produced substantial evidence that its competitor in the dairy distribution business threatened and harassed buyers to stop dealing with it; the defendant's actions were planned at its board meetings and "there was no doubt that the unlawful conspiracy was the material cause" of the plaintiff's injury. Id. . The fact that the rules were allegedly intended to discourage relocation does not support the inference that they prevented all other teams besides the Rams from pursuing a possible move to St. Louis. There were many legitimate reasons why owners may not have bid, and without evidence from those who did not bid about why they had not, the circumstantial evidence was insufficient to allow the case to be presented to the jury on causation.

The district court found it particularly significant that CVC had not presented evidence to show that it had sought bids from other teams. See Read v. Medical X-Ray Center, P.C., 110 F.3d 543, 546 (8th Cir.), cert. denied 118 S.Ct. 299 (1997); Admiral Theatre Corp., 585 F.2d at 893-94. Where a plaintiff has otherwise failed to present evidence of causation, he must show that he made "a demand on the defendant to allow the plaintiff to take some action or obtain some benefit, which the defendant's challenged practice is allegedly preventing the plaintiff from taking or obtaining, in order to prove that the practice caused injury in fact." Sullivan v. National Football League, 34 F.3d 1091, 1103 (1st Cir. 1994); see also Out Front Productions, Inc. v. Magid, 748 F.2d 166, 169-70 (3d Cir. 1984). The record shows no effort by CVC to solicit bids from other NFL teams and CVC did not contact any other NFL team to encourage it to consider the St. Louis opportunity. The negotiations between CVC and

the Rams were carried out in secret, and there was undisputed evidence that CVC had made a conscious decision to negotiate with only one team at a time.  In fact, the Rams had informed CVC they would back away if there were negotiations with other teams and even suspended talks when CVC leaked information to the press.

CVC claims that the evidence about its presentation to the NFL owners during the expansion process and its publication of the Rams "wish list" during its negotiations was sufficient to show that it had sought interest from other teams.  There was undisputed testimony that St. Louis had been passed over for expansion because of problems with its ownership group and lease, and there was no evidence that CVC made owners aware that these problems had been rectified.  Publication of the benefits the Rams sought in St. Louis was not the same as informing other owners CVC was seeking additional bidders.  CVC "may not recover for losses due to factors other than the [NFL's] anticompetitive violations."  National Association of Review Appraisers, 64 F.3d at 1135 (quoting Amerinet Inc. v. Xerox Corp., 972 F.2d 1483, 1494 (8th Cir. 1992)).  Since CVC failed to present evidence showing that the alleged conspiracy caused it injury, it did not make out the element of causation necessary for a Section 1 claim.

**3.**

The district court also ruled that CVC failed to present evidence to make out a submissible case of antitrust injury.  CVC says that its evidence tended to prove that the NFL's policies caused a reduction in competitive bidding which is an antitrust injury.  The NFL replies that the theory of CVC's case was that the very existence of Article 4.3 and the guidelines limited team bidding.  It did not show that they operated to make CVC's financial obligations greater than they should have been, there was no antitrust injury.  The league and team also argue that the rules did not result in a reduction in output of the number of NFL games, teams, or stadia which would be

necessary to show antitrust injury, citing <u>Chicago Prof'l Sports Ltd. Partnership v. NBA</u>, 95 F.3d 593 (7th Cir. 1996).

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful." <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977). CVC failed to offer proof of antitrust injury because it did not present evidence to show that there was a suppression of bidding on the St. Louis lease. There was no evidence at trial that any other willing and able bidder besides the Rams was in the market for a stadium and interested in the St. Louis opportunity at the time CVC was in the market for a tenant. A showing of antitrust injury requires proof that the possibility for the alleged harm to competition actually existed and that competition was diminished by the defendants' actions. "The Sherman Act does not require competitive bidding; it prohibits unreasonable restraints on competition." <u>National Society of Professional Engineers v. United States</u>, 435 U.S. 679 (1978) (organization's ethical rules prohibited competitive bidding). CVC presented no evidence that it was injured by a restraint on competition.

In sum, CVC did not make out a claim under Section 1 of the Sherman Act, and appellees were entitled to judgment as a matter of law.[9] It failed to present sufficient evidence to prove that the lack of expressed interest from other teams in the St. Louis opportunity was caused by Article 4.3 and other acts of a conspiracy consisting of the league and its members, and there was no evidence of antitrust injury.

**IV.**

---

[9]Because the league and teams are entitled to judgment as a matter of law on the Section 1 claim for the reasons discussed, it is not necessary to reach the issue raised by their cross appeal as to whether they are unable to conspire among themselves because they are a single economic enterprise under <u>Copperweld Corp.</u>, 467 U.S. 752 (1984) and <u>City of Mt. Pleasant</u>, 838 F.2d 268 (8th Cir. 1988).

-27-

CVC also claims that the NFL tortiously interfered with its contract with the Rams by charging the $29 million relocation fee after initially voting down the Rams' application to move. CVC argues that it was forced to pay the fee because of economic duress and that the required fee made its obligations to the Rams substantially more burdensome. The NFL responds that CVC failed to establish several of the essential elements of a tortious interference claim under Missouri law. The district court dismissed this claim because of lack of evidence of a breach induced by the NFL's conduct or of any intentional interference.

Missouri law requires a plaintiff alleging tortious interference with a contract to prove "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) the absence of justification; and (5) damages." Rice v. Hodapp, 919 S.W. 2d 240, 245 (Mo 1996) (en banc). CVC presented no evidence that the NFL's imposition of a high relocation fee caused a breach in its contract with the Rams. Despite having the option to terminate its contract with the Rams once it was decided that the fee would exceed $7.5 million, CVC agreed to pay the fee in order to be sure the Rams would play in St. Louis in 1995, the target year it had set. There was also no evidence that the intent behind the NFL's fee was to disrupt the contract between CVC and the Rams. It is not even clear that the team owners knew about the contract at the time the fee was set. CVC contends, however, that the NFL can be liable for tortious interference even without a breach if it caused the performance of the contract to be more burdensome and expensive, citing Restatement (Second) of Torts, § 766(A). CVC points to no Missouri authority which has recognized this theory, and a federal court ruling on a point of state law is obligated to follow the law as announced by that state's highest court. Gilstrap v. Amtrak, 998 F.2d 559, 560 (8th Cir. 1993); Carman v. Harrison, 362 F.2d 694, 698 (8th Cir. 1966). To adopt CVC's theory would be contrary to the Missouri requirement that a plaintiff prove that the defendant induce a breach of contract. Since CVC did not make out the required elements of this state tort, appellees were entitled to a judgment as a matter of law on it.

# V.

CVC had ample opportunity to prove the causes of action that are the subject of its appeal, and it took some four weeks to put in its evidence at trial. The many legal issues were briefed and argued by the parties before the district court ruled on them. Since CVC failed to produce sufficient evidence to make out essential elements required under Section 1 of the Sherman Act and under Missouri law on tortious interference, the league and the member teams were entitled to judgment as a matter of law. CVC has not shown on its appeal that it should have a new trial, and the cross appeal is dismissed as moot. Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.